# Sharpless and Others *versus* The Mayor, &c., of Philadelphia.

1. In determining whether an Act of the legislature is constitutional or not, we must look to the body of the constitution itself for reasons. The general principles of justice, liberty, and right, not contained or expressed in that instrument, are no proper elements of a judicial decision upon it.

2. If such Act be within the general grant of legislative power, that is, if it be in its character and essence a law, and if it be not forbidden expressly or impliedly either by the state or federal constitution, it is valid.

3. To make it void, it must be clearly not an exercise of legislative authority, or else be forbidden so plainly, as to leave the case free from all doubt.

4. An Act of Assembly authorizing a subscription of a city to the stock of a railroad corporation, is not forbidden by Art. 1, sec. XIII. of the state constitution; that section not being a restriction upon the legislative authority of the two Houses, but a bestowal of privilege upon the separate branches.

5. Such an Act does not impair the obligations of any existing contracts, nor does it attempt the impossibility of creating a contract, but merely authorizes two corporations to make one, if they shall see proper.

6. This is not such an injury to the plaintiffs' lands, goods, or persons, that they are entitled to a judicial remedy for it, agreeably to sec. XI. of Art. 9. It is no injury at all, except on the gratuitous assumption that it is forbidden in some other part of the constitution.

7. It does not violate the right of acquiring, possessing, and protecting property secured by section I. of Art. 9. The right of property is not so absolute but that it may be taxed for the public benefit.

8. This is not a taking of private property for public use, without compensation, contrary to sec. X. of Art. 9. When property is not seized, and directly appropriated to public use, though it be subjected in the hands of the owner to greater burdens than it was before, it is not *taken*.

9. It cannot be said that the plaintiffs will be *deprived* of their property, in violation of sec. IX. Art. 9. The settled meaning of the word deprive, as there used, is the same as that of the word *take*, in sec. X.

10. An Act of Assembly to authorize the taking of private property for *private* use, would be unconstitutional, because it would not be legislation, but a mere decree between private parties. But this is no taking in any sense, for any purpose, or for any uses.

11. The plaintiffs have no ground of complaint against the Acts of Assembly now in question, except because they authorize the creation of a public debt, of which they may be required, hereafter, to pay a part in the shape of taxes. By taxation alone can any harm ever come to them.

12. If it be within the scope of legislative power, with the consent of the local authorities, to permit the assessment of a local tax, for the purpose of assisting a corporation to build a railroad bearing to the tax-payer the relation which these roads do, then the laws complained of are unobjectionable.

[Sharpless *v.* Mayor of Philadelphia.]

13. Taxation is a legislative right and duty, which must be exercised by the General Assembly by laws passed by them, or under their authority.

14. The power of the Assembly, with reference to taxation, is limited only by their own discretion. For the abuse of it, members are accountable to nobody but their constituents.

15. By taxation is meant a certain mode of raising revenue for a public purpose in which the commuity that pays it has an interest. The right of a state to lay taxes has no greater extent than this.

16. An Act of the legislature authorizing contributions to be levied for a mere private purpose, or for a purpose which, though it be public, is one in which the people from whom they are exacted have no interest, would not be a law, but a sentence commanding the periodical payment of a certain sum by one portion or a class of the people to another. The power to make such order is not legislative, but judicial; and was not given to the Assembly by the general grant of legislative authority.

17. But to make a tax law unconstitutional on this ground, it must be apparent at first blush, that the community taxed can have no possible interest in the purpose to which their money is to be applied. And this is more especially true if it be a local tax, and the local authorities have themselves levied the tax in pursuance of an Act of Assembly.

18. If therefore, the making of a railroad be a mere private affair, or if the people of Philadelphia have manifestly no interest in the railroads which run to and towards the city from Easton and from Wheeling, then these laws are unconstitutional.

19. But railroads are not private affairs. They are public improvements, and it is the right and duty of the state to advance the commerce and promote the welfare of the people by making or causing them to be made at the public expense.

20. If the state declines to make desirable or public improvement, she may permit it to be done by a company, and the fact that it was made by a private corporation does not take away its character as a public work.

21. The right of the company, by which it is made, to be compensated for the expense of constructing it, by taking tolls for its use, though it gives the corporation an interest in it, does not extinguish the interest of the public nor make the work a private one; because to say nothing of the advantages, the public can pay the toll, and still carry and travel on it very much cheaper than without it.

22. The state may, therefore, rightfully aid in the execution of such public works, by delegating to the corporation the right of eminent domain as she always does, or by an exertion of the taxing power, as she has done very often.

23. The right of the legislature with the consent of the local authorities, to tax a particular city for a local improvement, is as clear as the right to lay a general tax for any public purpose whatsoever.

24. The state having the constitutional power to create a state debt by a subscription on behalf of the whole people to the stock of a private corporation engaged in making a public work, it follows, from what has been before said, that she may authorize a city or district to do the same thing, provided such city or district has a special interest in the work to be so aided.

25. This is not a case in which we can determine as a matter of law, that the city has no interest in the proposed railroad. That this is true as a matter of fact, has not even been asserted in the argument.

26. The legislature and the Councils have decided that the city has an interest large enough to justify the subscription; we cannot gainsay this without declaring all interest to be flatly impossible, and to do that would be an absurdity.

27. Finally: The authorities of the city, in accordance with the charter and with certain laws supplementary thereto, are about to create a public

[Sharpless v. Mayor of Philadelphia.]

debt for a public purpose, in which the city has an interest. It will be as valid and binding as if it had been legally contracted to accomplish any public purpose for the benefit of the city.

This was a proceeding had upon a bill in equity, filed in the Supreme Court, at the instance of William P. Sharpless, and three others, of the city of Philadelphia (as well for themselves as for such other citizens, residents, and tax-payers, of the said city, who, agreeing to contribute to the expenses of the suit, may become parties thereto), against the Mayor, Aldermen, and Citizens of Philadelphia, and against Charles Gilpin, Mayor of the said city.

It was averred in the bill that the petitioners were residents and owners of real and personal estate within the city of Philadelphia, and were therefore interested in a question which may increase the amount of taxes chargeable upon property in the said city. It was averred that the defendants were about, for and in behalf of the city of Philadelphia, and in the name of the city, to contract for, or subscribe to, stock of "The Philadelphia, Easton, and Water-Gap Railroad Company," a company incorporated by an Act approved on 19th February, 1849, to the extent of 10,000 shares at $50 per share, and to make payment therefor by the issue of bonds of said city, bearing an interest at the rate of six per cent. per annum, to the amount of $500,000; and also that they were about to subscribe 10,000 shares at $50 per share of the stock of "The Hempfield Railroad Company," incorporated in pursuance of an Act approved on the 15th May, 1850, and to make payment therefor by the issue of bonds of the city, bearing an interest of six per cent., to the amount of $500,000.

It was averred that the petitioners had been advised that the said contracts or subscriptions, and the making and issuing of the bonds, are without any warrant or authority of law whatsoever; and in order that the defendants may show, if they can, why the relief prayed for should not be had, that the defendants may, by their proper officers, answers make to interrogatories submitted:—And also that the defendants may be restrained from so subscribing or pledging the faith of the city in any way for the said stock; and that it be declared that such subscription would be null and void, and an injunction to restrain the defendants from making the said subscriptions, &c., was asked for, and a writ of subpœna to them to appear and answer, and abide the further order of the Court therein. An affidavit of one of the petitioners, dated the 10th day of May, 1853, was added of his belief of the matters of fact stated in the petition.

A joint and several answer, attested by the Mayor under the corporate seal, and signed by him and the Solicitor, was filed. In it, it was averred that the city was incorporated by Act of As-

N 2

[Sharpless *v.* Mayor of Philadelphia.]

sembly, approved on 11th March, 1789. That by an Act of Assembly of 9th April, 1853, a copy of which was exhibited, the city was authorized to subscribe for 10,000 shares of the capital stock of the Hempfield Railroad Company. That by an Act, approved on the 6th May, 1852, the city was authorized to subscribe for shares of the capital stock of the Philadelphia, Easton, and Water-Gap Railroad Company. That the select and common councils, on the 14th April, 1853, enacted an ordinance with reference to the subscription to shares of the stock of the Hempfield Railroad Company; and on the 10th March, 1853, they passed one with reference to subscription to shares of the stock of the Philadelphia, Easton, and Water-Gap Railroad Company. That in pursuance of law and of the ordinance, the respondent, Charles Gilpin, on 10th May, 1853, subscribed for 10,000 shares of the stock of the Hempfield Railroad Company, but that no subscription to the other company had yet been made, inasmuch as the conditions in the ordinance had not been complied with, but that it was intended to subscribe as soon as the conditions were performed by the said company. It was alleged that the trade and industry of the citizens of Philadelphia would be augmented by securing thereto, by the most advantageous line of public improvements, that of a large portion of north-east Pennsylvania, and of the counties of Washington and Westmoreland, and of the commerce of the west. That the defendants were stockholders in the Pennsylvania Railroad, to the extent of four millions of dollars, and their interests therein would be enhanced by the profits to be made upon the travel and tonnage led to it by means of the Hempfield Railroad. And further, that the subscriptions will not impair the credit of the city, and that they have been advised that the subscriptions are authorized by law. Answers to the interrogatories were added.

The enactments referred to were as follows:

Act of 9th April, 1853, entitled "An Act to authorize the city of Philadelphia to subscribe to the capital stock of the Hempfield Railroad Company."

Section 1. Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same, that the city of Philndelphia is hereby authorized to subscribe for 10,000 shares in the capital stock of the Hempfield Railroad Company, and to borrow money to pay therefor, and to make provision for the payment of the principal and interest of the money so borrowed, as in other cases of loans to said city; or payment for said shares may be made in stock held by said city, and in such mode as shall hereafter be agreed upon by said city and said Hempfield Railroad Company; and the said city may be

[Sharpless v. Mayor of Philadelphia.]

represented at elections and other meetings of said company, by agents duly authorized to act by resolution of the councils thereof.

Section 4 of the Act approved on 6th May, 1852:—That it shall be lawful for the constituted authorities of the city of Philadelphia, the incorporated districts in the county of Philadelphia, the borough of Easton in the county of Northampton, and the counties of Monroe and Pike, or either of them, to subscribe for shares in the capital stock of the Philadelphia, Easton, and Water-Gap Railroad Company, to borrow money to pay therefor, and to make provision for the principal and interest of the money so borrowed, as in other cases of loans to said city, counties, boroughs, and townships respectively, &c., and no certificate of a loan or bond shall be for a less sum than $100, and shall be transferable only on the books of the respective city, districts, counties, and boroughs, kept for that purpose; and the certificates of loans or bonds issued or to be issued by such authorities, for the purpose aforesaid, bearing an interest of six per cent. per annum, payable half-yearly, shall be received as cash at par by the said company in payment of the instalments or shares subscribed as aforesaid; and the said city, counties, boroughs, and townships, respectively, may vote at the elections of said company, by their officers specially authorized for the purpose, in the same manner as individual stockholders; and the said company shall not sell or dispose of, below their par value, any bonds received in payment of stock subscriptions, as aforesaid, without giving at least sixty days' notice to the municipal corporation having issued the same, that an instalment or instalments have been called in upon said stock; and if the said corporations shall pay the instalment or instalments so called, the bonds shall be returned to them; but, upon their failure to make such payments, the company shall have power to dispose of said bonds to the best advantage: *provided,* that no subscription made by any municipal corporation, authorized by this section to subscribe to the capital stock of said company, shall exceed ten per cent. on the assessed valuation of the real and personal estate in the city, district, borough, or county, making such subscription.

*B. H. Brewster* and *Mallery,* for complainants.—It was contended that the Acts authorizing the subscriptions referred to, were *unconstitutional,*

1. Because they confer upon the city of Philadelphia a high function, which the legislature cannot transfer to it or to any municipality for such a purpose, and with which the legislature cannot part to any one.

2. Because the power given by these statutes permit the city to take private property without compensation.

[Sharpless *v.* Mayor of Philadelphia.]

3. Because they authorize the city to tax for a purpose not within the scope of the necessary duties of a municipal corporation, thereby granting it such a power as it cannot acquire, or the legislature impart to it.

It was said that the city councils are not the agents of the state; they are the agents of the people of this city, elected for a certain purpose, well understood and ascertained at the time of their election, and their powers cannot now be enlarged at the arbitrary pleasure of the legislature. Even though the legislature possessed the power to authorize the subscription, still the people of Philadelphia would have a right to accept or reject, not by a direct action upon the subject, but by the voice of new councilmen elected to pass upon this question. It was said that the legislature cannot permanently transfer its power of making laws to other hands; for being but a delegated power from the people, they who have it cannot pass it over to others: *Locke on Government* 291; *Rutherford's Institutes* 273; Parker *v.* Commonwealth, 6 *Barr* 507; 4 *Harrington* 485; 5 *Call* 140; 10 *Howard* 534.

The legislature does not possess unlimited power: 4 *Peters* 517, Providence Bank *v.* Billings; 5 *W. & Ser.* 173, Norman *v.* Heist; 4 *Wheaton* 558; 2 *Peters* 413, Fletcher *v.* Peck; 5 *Paige* 146; *Saxton's Ch.* 695–6.

The right of taking private property for public use was originally founded on *state necessity.* The right has since been more liberally construed, the term *public use* has been substituted, but what shall be considered as public use is unsettled: *Saxton's Ch.* 695.

All public taxation, to be fair, should be equal in proportion to the value of property, so that no one class of individuals and no one species of property may be unequally or unduly assessed: 2 *Kent* 332. Though the legislature have the constitutional authority to confer the taxing power upon local corporations, for such purposes only as are necessary for the local convenience, *B. Munroe* 338, a town in its corporate capacity will not be bound even by a vote of the majority, to the performance of contracts or other legal duties not coming within the scope of the objects and purposes for which it was incorporated: 11 *Pick.* 396; 13 *Mass.* 272; 16 *Id.* 48; 12 *Pick.* 272; *Id.* 480. It was said that by the subscriptions in question, the citizens of Philadelphia were to be charged with a debt in order to secure a *remote* advantage, to carry out an object which was independent and foreign from its municipal duties.

The case of McDermott *v.* Kennedy, *Brightly's Rep.* 335–6, was referred to for the position that making a railroad not within the limits of the borough, did not touch or affect the corporate rights; that it may affect *private rights,* but that the regulation of private rights was not vested in the borough. It was stated that

[Sharpless v. Mayor of Philadelphia.]

the cases decided out of Pennsylvania did not justify the statutes under which the subscriptions in question in this case were made. These authorities may be found in 15 *Conn.* 475; 9 *Humph.* 252; 9 *B. Munroe* 330, 526; 8 *Leigh* 120; 3 *Grattan* 247; 9 *Dana* 517; 5 *Id.* 28; 5 *Call* 139; 24 *Wend.* 66, 68. That the principle decided in them is, That a statute authorizing subscriptions to railways or other public improvements as indirect corporate purposes, must be for works that have a direct connection with a corporate town claiming them as corporate purposes, more direct than that which would result from the general increased prosperity of the country by reason of such improvements made, without a direct reference to or in direct connection with the town. It was intimated that the subscriptions, in the cases in question, were not for a usual and necessary corporate purpose, for the immediate and direct advantage of the city, or for its exclusive benefit; that their objects were general and their benefits local, applying mainly to those sections of country wherein they lie; and it was said that they were not within the limits of the city of Philadelphia.

If an Act of the legislature be repugnant to the constitution, it is *ipso facto* void, and the Courts have the power, and it is their duty, so to declare it: 2 *Peters* 522; 12 *Wheaton* 270; 3 *Dallas* 386; 1 *Kent* 447–455; numerous other authorities were cited.

As to the exercise of the right of *eminent domain*, were cited 14 *Wend.* 51; 5 *Paige Ch.* 137, Varrick v. Smith; 3 *Id.* 72; 5 *Gill* 390; 11 *Wend.* 151; 19 *Id.* 659.

As to the power of the legislature to impose taxes: 4 *N. Hamp.* 565; 2 *Mass.* 276; 6 *Id.* 408; 13 *Id.* 272; 16 *Pick.* 572; 12 *Id.* 227; 11 *Id.* 396; 13 *Id.* 61; 5 *Gill* 390; 2 *Id.* 11; 2 *Shepley* 379; 8 *Blackford* 361; 24 *Wend* 66; 3 *Grattan* 247; 11 *Vermont* 402.

As to what is *public use*: 12 *Pick.* 467; 2 *Shepley* 379; 6 *Geo.* 130; 4 *Ham.* 286; 3 *Paige Ch.* 72; 5 *Id.* 143; 2 *Wend.* 66; 7 *Cow.* 606.

As to powers of *municipal corporations*: 15 *John.* 358; 2 *Mass.* 27; 13 *Id.* 199; *Id.* 272; 9 *Wend.* 384; 13 *Id.* 331; 12 *Pick.* 193; *Id.* 227; 24 *Id.* 355; 8 *Blackford* 361; 9 *Conn.* 175; 11 *Verm.* 402.

On part of the respondents, were *Olmsted*, Solicitor, and *Dallas*, *Brock*, and *Read*.—The individual states of the Union possess all the rights of sovereignty which were not exclusively delegated to the general government by the constitution of the United States, with an independent and uncontrollable authority to raise their own revenues for the supply of their own wants. Each state government exercises all such rights of sovereignty in

[Sharpless *v.* Mayor of Philadelphia.]

the manner pointed out in its constitution, subject only to the limitations therein. There is no provision in the constitution of the United States, which conflicts with the laws in question. The only question is whether they conflict with the constitution of this state. Either by the 9th article (the declaration of rights), or any other of the articles of it, there is no limitation upon the legislative power of borrowing and raising money, and of laying taxes for any purpose. The power is not controlled by the last clause of the 10th section of the 9th article in these words: "Nor shall any man's property be taken or applied to public use without the consent of his representives, and without just compensation being made."

A similar provision is to be found in the constitution of the United States, and in almost every state constitution, and is but an enunciation of a right recognised by the law of nations, and which is called sovereign or transcendental property, or the right of eminent domain. This right or power was originally exercised in time of war, as where a town was to be fortified, and the gardens, lands, or houses of private citizens were taken where ramparts or ditches were to be raised, or materials owned by private individuals were taken and made use of in public fortifications. So in times of general scarcity, where the storehouses and granaries of private individuals are set open; or, in the extremities of the state, where moneys intrusted with the government are seized.

This right of eminent domain, in modern times, has been principally applied to the taking of land for public works, either by the state or its delegated agents, upon just compensation being made ; and is well described in Erskine's Principles of the Law of Scotland, page 108. "Every state or sovereign has a power over private property, called by some lawyers *dominium eminens*, in virtue of which the proprietor may be compelled to sell his property for an adequate price, where an evident utility on the part of the public demands it."

The existence of this right in the several states, uncontrolled by the constitution of the United States, is fully recognised by the Supreme Court of the United States, in the case of the West River Bridge Company *v.* Dix, 6 *Howard* 507.

The right of eminent domain is not to be confounded with the power of *taxation*, or with the power of borrowing money. The same rules are applicable to it as to the loss of merchandise thrown overboard to save a vessel. The property taken is not the contribution of its owner to the public, as his share of the public burden ; but is that which he is forced to sell for a just price, and without reference to the amount exacted from others. The right of eminent domain is an extraordinary power exercised only in

case of necessity, or manifest public utility; whilst taxing and borrowing are the ordinary and usual modes of supporting all branches of the government : 4 *Comstock* 419.

The state or its agents, whether corporate bodies or individuals, had always taken lands for public use under the 10th section of the 9th article, but it sometimes happened that after the property was taken the corporations became insolvent, and the compensation was never paid.    To remedy this evil, the convention added the 4th section of the 7th article, in these words : " The legislature shall not invest any corporate body or individual with the privilege of taking private property for public use without requiring such corporation or individual to make compensation to the owners of said property, or give adequate security therefor before such property shall be taken.    This has no relation *to the taxing power*, nor is it any limitation of it.    The legislature of Pennsylvania have the power to borrow money, 4 *Wheaton* 651 ; 8 *Id.* 584 ; 2 *Peters* 410–414 ; *Id.* 656 ; and the power to tax ; and they have exercised the right to devolve portions of these powers upon counties, townships, boroughs, cities, and other bodies corporate. As to the right of the state to levy taxes for the use of the Commonwealth, reference was made to 6 *Barr* 80.    The general authority to perform these, under laws of a special character, is not to be questioned ; another question remains as to what extent they can be carried beyond the territorial boundaries of a corporation.

It was said that this depended on the question whether they are particularly beneficial to the municipal body, and that this was a subject of legislative and not judicial discretion, particularly when taken in connection with the independent action of the corporation itself.    Money may be expended forty miles off to bring water to a city, or at any necessary distance to introduce gas.    This has actually been done, on a larger or smaller scale, at Boston, New York, and Philadelphia.    This settles the general question ; and when, therefore, a municipal corporation is authorized to lay out money, or loan its credit to any work connected with its prosperity, the sole remaining question can only be, does it come within the general rule ; will it materially and certainly benefit its inhabitants ?    And this is, after all, a matter addressed to the discretion of the legislative body and of the municipal authorities : *Smith's Wealth of Nations*, vol. 1, p. 151 ; 2 *M'Cullough's Dic.* 414, referred to.    It was said that the Philadelphia and Water-Gap Railroad was expected to bring to Philadelphia a portion of the trade of the Lehigh and adjacent country, and of the north-eastern counties of Pennsylvania, and of western New York ; and that the Hempfield road was to connect with the Pennsylvania Railroad, to the stock of which the city of Philadelphia had subscribed to

the amount of four millions. It was said that these two roads are essential to the prosperity of Philadelphia.

It was therefore contended, that the legislative power to borrow money, and to tax, was unlimited; and that its exercise depended upon the *discretion* of the legislature: that portions of the power may be intrusted to municipal corporations, limited only by the same discretion, and that neither of which is the subject of judicial revision. In support of the power to authorize subscriptions, or to tax, the following cases were referred to, the first being decided in 1837: 8 *Leigh* 120, Goddin *v.* Crump; 3 *Grattan* 247, Harrison *v.* Holland; 24 *Wend.* 65, Thomas *v.* Leland; 15 *Connecticut* 475, The City of Bridgport *v.* The Housatonic Railroad Co.; 8 *Humph.* 252, Nicholl *v.* Mayor, &c.; 9 *B. Munroe* 526, Talbot *v.* Dent; 5 *Gilman* 405, Shaw *v.* Dennis; 1 *Jones* (*Penn.*) 61, Comm. *v.* McWilliams; 4 *Comstock* 419, People *v.* Mayor &c. of Brooklyn; 20 *Ohio* 609–625, Griffith *v.* Comm'rs of Crawford County; The Cincinnati, W., & Zanesville Railroad Co. *v.* Comm'rs of Clinton County, *Ohio Reports*, a case lately decided. In this case, the commissioners of Clinton county, Ohio, were authorized to subscribe to the stock of a railroad company, and the question of subscription was, according to law, submitted to the qualified voters of the county, and a majority given in favor of the subscription, and the subscription was made. The commissioners, however, declined to issue the bonds of the county, and a writ of *mandamus* was allowed against them. The material question was the *constitutionality* of the Act of the legislature. The opinion was delivered by RANNEY, J.; the Delaware case of Rice *v.* Foster, *Harrington's Rep.* 479, of Parker *v.* Com'th., 6 *Barr* 507, Com'th. *v.* Judges, 8 *Barr* 391, the case of Com'th. *v.* Painter and others, 10 *Barr* 214, were referred to, and a peremptory *mandamus* was awarded. Also, the case of Steubenville Railroad *v.* The Trustees of North *Township*, determined by the issuing of a peremptory *mandamus*: also the Kentucky case of Slack *v.* The Maysville and Lexington Railroad Co., *B. Munroe Rep.*: the Louisiana case of Police Jury *v.* McDonough's Successors, opinion by C. J. SLIDELL.

Appended to the argument was a memorandum as to various laws authorizing municipal subscriptions to public works, viz.: One by Congress, authorizing the corporations of Washington, Georgetown, and Alexandria to subscribe to the stock of "The Chesapeake and Ohio Canal Company:" and of numerous laws enacted in above twenty of the states, including above ninety by the legislature of Pennsylvania.

*Campbell* on same side.—He regarded the constitutional provisions with reference to the extent of legislative power, as limitations upon that power, which would otherwise be uncontrolled:

[Sharpless v. Mayor of Philadelphia.]

that the legislature was entitled to exercise the whole power of the people, except when its limit is restricted by the express words of the constitution : 2 *Rawle* 373, opinion of ROGERS, J., in Com'th. *v.* McCloskey ; 3 *Watts* 295, McMasters *v.* Com'th. ; see Norris *v.* Clymer, 2 *Barr* 277 ; 2 *W. & Ser.* 320, see opinion of KENNEDY, J. ; Comth. *v.* Hartman, 5 *Harris* 119 ; Monon. Nav. Co. *v.* Coons, 6 *W. & Ser.* 117.

The right to take the property of the citizen for public use *even without compensation*, is inherent in every sovereignty : Opinion of KENNEDY, J., 2 *W. & Ser.* 323–4. Without a constitutional limitation, *compensation* would be *of grace.* The sovereign power may call upon every citizen to surrender a portion of his property for the public good in two ways ; one *by taxation*, and the other by virtue of that sovereign right referred to. The right of taxation, and the power of taking private property for public use with compensation under the constitution, are *distinct and independent*, else in the case of taxation, the citizen must be *compensated*, as he is entitled under the Constitution when his private property is taken for public use. These rights may be delegated to municipalities. The power in the cases in question was exercised not in virtue of the right of eminent domain, but by virtue of *the taxing power*. Taxation is money or services required from the citizen as his share of the public burdens. The right of *eminent domain* is the taking of something from the citizen beyond his share of the public burden. Taxation operates upon the whole community taxed by some defined rule of apportionment : the right of eminent domain operates upon individuals specifically, and not upon the community at large. For taxation, the compensation is the security afforded by the government for life, liberty, and property ; in exercising the right of eminent domain, the sovereign power may become the debtor of the particular citizen, and may justly owe to him compensation. Thus, when a city is lighted and watched, it is by virtue of *the taxing power;* when a turnpike or railroad is run through its limits, the property of its citizens is taken in exercise of the right of *eminent domain* delegated to the corporation constructing the public work.

The power exercised in the cases in question, is not within the clause of the constitution as to *taking* property for public use. No property was *taken* in these cases, and therefore compensation is not required to be made : O'Connor *v.* City of Pittsburgh, 6 *Harris* 187. He made special reference to the case of Com'th. *v.* McWilliams, 1 *Jones* 62, as expressly deciding the main questions in this case.

In this case each of the judges delivered a separate opinion.

O

[Sharpless *v.* Mayor of Philadelphia.]

The opinion of BLACK, C. J., was as follows:

On the 6th of March, 1852, an act was passed by the legislature, authorizing the corporate authorities of Philadelphia city to subscribe for shares in the stock of the Philadelphia, Easton, and Water-Gap Railroad Company, and to raise the money necessary to pay for such stock by a loan on the credit of the city. On the 9th of May, 1852, a similar act was passed for a similar subscription to the stock of the Hempfield Railroad Company. In pursuance of these acts, the Select and Common Councils required the Mayor, as the executive magistrate of the city, to subscribe for ten thousand shares in the Hempfield Company forthwith, and for the same number in the Water-Gap Company, upon certain conditions. The Mayor has made one subscription accordingly, and intends to make the other as soon as the condition of the ordinance is complied with.

The plaintiffs are residents of the city, owners of property therein, and tax payers. They complain that these subscriptions will add another million of dollars to the already heavy debt of the city, impair the public credit thereof, and greatly augment the taxes of the people. The object of the bill is to restrain the Mayor from carrying the ordinances into effect. The whole subject has been argued on the motion for a special injunction. Our decision now will terminate the controversy, and have all the effect of a final decree.

None of the facts are disputed. No question of construction is raised on the Act of Assembly, or on the ordinances. It is not pretended that anything has been done, or is likely to be done by the authorities of the city, except what the legislature meant to authorize. But the plaintiffs assert that the laws are unconstitutional and void. Whether the legislature can pass a valid act giving to a municipal corporation the power of subscribing to the stock of a railroad company, is the sole question before us.

This is, beyond all comparison, the most important cause that has ever been in this Court since the formation of the government. The fate of many most important public improvements hangs on our decision. If all municipal subscriptions are void, railroads, which are necessary to give the state those advantages to which everything else entitles her, must stand unfinished for years to come, and large sums, already expended on them, must be lost. Not less than fourteen millions of these stocks have been taken by boroughs, counties, and cities within this Commonwealth. They have uniformly been paid for, either with bonds handed over directly to the railroad companies, or else with the proceeds of similar bonds sold to individuals who have advanced the money. It may well be supposed that a large amount of them are in the hands of innocent holders, who have paid for them in good faith. We

[Sharpless v. Mayor of Philadelphia.]

cannot award the injunction asked for, without declaring that all such bonds are as destitute of legal validity as so much blank parchment. Besides the deadly blow it would give to our improvements, and the disastrous effect of it on the private fortunes of many honest men, at home and abroad, it would seriously wound the credit and character of the state, and do much to lessen the influence of our institutions on the public mind of the world.

The reverse of this picture is not less appalling. It is even more so, as some view it. If the power exists, it will continue to be exerted, and generally it will be used under the influence of those who are personally interested, and who do not see or care for the ultimate injury it may bring upon the people at large. Men feel acutely what affects themselves as individuals, and are but slightly influenced by public considerations. What each person wins by his enterprise, is all his own; the public losses are shared by thousands. The selfish passion is intensified by the prospect of immediate gain; private speculation becomes ardent, energetic, and daring, while public spirit—cold and timid at the best—grows feebler still when the danger is remote. Under these circumstances it is easy to see where this ultra-enterprising spirit will end. It carried the state to the verge of financial ruin; it has produced revulsions of trade and currency in every commercial country; it is tending now, and here, to the bankruptcy of cities and counties. In England, no investments have been more disastrous than railway stocks, unless those of the South Sea bubble be an exception. In this country they have not generally been profitable. The dividends of the largest works in the neighboring states, north and south of us, have disappointed the stockholders. Not one of the completed railroads in this state has uniformly paid interest on its cost. If only a few of the roads projected in Pennsylvania should be as unfortunate as all the finished ones, such a burden would be imposed on certain parts of the state, as the industry of no people has ever endured without being crushed. Still, this plan of improving the country, if unchecked by this Court, will probably go on until it results in some startling calamity, to rouse the masses of the people.

But all these considerations are entitled to no influence here. We are to deal with this strictly as a judicial question. However clear our convictions may be, that the system is pernicious and dangerous, we cannot put it down by usurping authority which does not belong to us. That would be to commit a greater wrong than any which we could possibly repair by it. So on the other hand, the loss to the bond-holders—the ruin of the railroad companies—the injury to the commerce, and even the stain on the character of the state, are considerations which cannot be weighed for a moment, in any scale of ours, against the constitutional rights

of the parties before us.  We will therefore address ourselves to the serious business of ascertaining whether the laws in question do violate the constitution or not.

It is important, first of all, to settle the rule of interpretation. This can be best done by a slight reference to the origin of our political system. · In the beginning the people held in their own hands all the power of an absolute government.  The transcendant powers of Parliament devolved on them by the revolution (1 *Bald.* 220 ; 8 *Wheaton* 584 ; 2 *Peters* 656).  Antecedent to the adoption of the federal constitution, the power of the states was supreme and unlimited (3 *Ser. & R.* 68).  If the people of Pennsylvania had given all the authority which they themselves possessed, to a single person, they would have created a despotism as absolute in its control over life, liberty, and property, as that of the Russian autocrat.  But they delegated a portion of it to the United States, specifying what they gave, and withholding the rest.  The powers not given to the government of the Union were bestowed on the government of the state, with certain limitations and exceptions, expressly set down in the state constitution.  The federal constitution confers powers particularly enumerated ; that of the state contains a general grant of all powers not excepted:  The construction of the former instrument is strict against those who claim under it ; the interpretation of the latter is strict against those who stand upon the exceptions, and liberal in favor of the government itself.  The federal government can do nothing but what is authorized expressly or by clear implication ; the state may do whatever is not prohibited.

The powers bestowed on the state government were distributed by the constitution to the three great departments : the legislative, the executive, and the judicial.  The power to make laws was granted in section 1 of Art. 1, by the following words : " *The legislative power of this Commonwealth shall be vested in a General Assembly*, which shall consist of a Senate and House of Representatives."  It is plain that the force of these general words, if there had been nothing elsewhere to qualify them, would have given to the Assembly an unlimited power to make all such laws as they might think proper.  They would have had the whole omnipotence of the British parliament.  But the absolute power of the people themselves had been previously limited by the federal constitution, and they could not bestow on the legislature authority which had already been given to Congress.  The judicial and executive powers were also lodged elsewhere, and the legislative department was forbidden to trench upon the others by an implication as clear as words could make it.  The jurisdiction of the Assembly was still further confined by that part of the constitution called the "Declaration of Rights," which, in twenty-five sections, carefully enume-

rates the reserved rights of the people, and closes by declaring that "everything in this Article is *excepted out of the general powers* of the government, and shall remain for ever inviolate." The General Assembly cannot, therefore, pass any law to conflict with the rightful authority of Congress, nor perform a judicial or executive function, nor violate the popular privileges reserved by the Declaration of Rights, nor change the organic structure of the government, nor exercise any other power prohibited in the constitution. If it does any of these things, the judiciary claims, and in clear cases has always exercised, the right to declare such acts void.

But beyond this there lies a vast field of power, granted to the legislature by the general words of the constitution, and not reserved, prohibited, or given away to others. Of this field the General Assembly is entitled to the full and uncontrolled possession. Their use of it can be limited only by their own discretion. The reservation of some powers does not imply a restriction on the exercises of others which are not reserved. On the contrary, it is a universal rule of construction, founded in the clearest reason, that general words in any instrument or statute are strengthened by exceptions, and weakened by enumeration. To me, it is as plain that the General Assembly may exercise all powers which are properly legislative, and which are not taken away by our own, or by the federal constitution, as it is that the people have all the rights which are expressly reserved.

We are urged, however, to go further than this, and to hold that a law, though not prohibited, is void if it violates the spirit of our institutions, or impairs any of those rights which it is the object of a free government to protect, and to declare it unconstitutional if it be wrong and unjust. But we cannot do this. It would be assuming a right to change the constitution, to supply what we might conceive to be its defects, to fill up every *casus omissus*, and to interpolate into it whatever in our opinion ought to have been put there by its framers. The constitution has given us a list of the things which the legislature may not do. If we extend that list, we alter the instrument, we become ourselves the aggressors, and violate both the letter and spirit of the organic law as grossly as the legislature possibly could. If we can add to the reserved rights of the people, we can take them away; if we can mend, we can mar; if we can remove the landmarks which we find established, we can obliterate them; if we can change the constitution in any particular, there is nothing but our own will to prevent us from demolishing it entirely.

The great powers given to the legislature are liable to be abused. But this is inseparable from the nature of human institutions. The wisdom of man has never conceived of a government with power

[Sharpless *v*. Mayor of Philadelphia.]

sufficient to answer its legitimate ends, and at the same time inca-
pable of mischief. No political system can be made so perfect
that its rulers will always hold it to the true course. In the very
best a great deal must be trusted to the discretion of those who
administer it. In ours, the people have given larger powers to the
legislature, and relied, for the faithful execution of them, on the
wisdom and honesty of that department, and on the direct account-
ability of the members to their constituents. There is no shadow
of reason for supposing that the mere abuse of power was meant
to be corrected by the judiciary.

There is nothing more easy than to imagine a thousand tyran-
nical things which the legislature may do, if its members forget
all their duties; disregard utterly the obligations they owe to their
constituents, and recklessly determine to trample upon right and
justice. But to take away the power from the legislature because
they may abuse it, and give to the judges the right of controlling
it, would not be advancing a single step, since the judges can be
*imagined* to be as corrupt and as wicked as legislators. It has
been said of the ablest judge that ever sat on this bench, and one
whose purity of character was as perfect as any who has ever lived
or ever will live, that his opinions on such subjects are not to be
relied on. If this be so, then transferring the seat of authority
from the legislature to the Courts, would be putting our interests
in the hands of a set of very fallible men, instead of the respect-
able body which now holds it. What is worse still, the judges are
almost entirely irresponsible, and heretofore they have been alto-
gether so, while the members of the legislature, who would do the
imaginary things referred to, " would be scourged into retirement
by their indignant masters."

I am thoroughly convinced that the words of the constitution
furnish the only test to determine the validity of a statute, and
that all arguments, based on general principles outside of the con-
stitution, must be addressed to the people, and not to us.

A proposition which results as plainly as this does, from the
reason of the thing, can scarcely need the aid of authority; for it
must be admitted that such measures cannot be sustained on prin-
ciples of moral justice and propriety. But, if the doctrine I am
denying could be allowed to prevail, it would decide this case in
favor of the plaintiffs, without looking into the constitution at all.
This consideration, together with the great ability and earnestness
with which it was pressed upon us by the counsel, entitles it to the
fullest refutation we can give.

It is true, that expressions favoring it, have incidentally fallen
from several eminent judges: from Judge PATTERSON (2 *Dall.* 304);
from Judge CHASE, (1 *Cond. Rep.* 173 ); from Judge SPALDING, of
Ohio (20 *Ohio Rep.* 609); and from Chief Justice PARKER, of Mas-

sachusetts (2 *Pick.* 165). The first is contained in a charge delivered in the Circuit Court. But the whole case has several times been said by this Court to have been totally misapprehended (16 *S. & R.* 179 ; 3 *Watts* 295). It was not followed by those who sat in the same Court afterwards. The others were mere *obiter dicta.*

On the other side, the weight of authority is overwhelming. I am not aware that any State Court has ever yet held a law to be invalid, except where it was clearly forbidden. Certainly, no case of a different character has been cited at the bar. In the many cases which affirm the validity of state laws, this principle is uniformly recognised, either tacitly or expressly. The Supreme Court of the United States has adhered to it on every occasion when it has been questioned there. In Satterlee v. Matthewson (2 *Peters* 380), an act of the Pennsylvania legislature was censured as unwise and unjust; but, because it came within no express prohibition of the constitution, it was held to be binding on the parties interested; and in Fletcher v. Peck (6 *Cranch* 87), it was declared, that while the legislature was within the constitution, even corruption did not make its acts void. In Calder v. Bull (3 *Dall.* 386), Mr. Justice IREDELL said : " If a State Legislature shall pass a law, within the general scope of their constitutional powers, the Court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard, the ablest and the purest men have differed upon the subject ; and all the Court, in such an event, could say, would be that the legislature (possessed of an equal right of opinion) had passed an act, which, in the opinion of the judges, was contrary to abstract principles of right." Judge WASHINGTON, in Golden v. Rice (3 *W. C. C. R.*), decides that the state legislatures may make such laws as they think fit, unless inconsistent with the powers exclusively vested in the government of the United States, or forbidden by some article of the federal or state constitution. Judge BALDWIN, in Bennet v. Boggs (1 *Bald.* 74), has expressed so clearly what I think is the true view of the subject, that I cannot do better than transcribe his words : " We may think," says he, " the powers conferred by the constitution of this state too great or dangerous to the rights of the people, and that limitations are necessary ; but we cannot affix them, or act on cases arising under state laws, as if boundaries had been affixed by the constitution previously. We cannot declare a legislative act void because it conflicts with our opinions of policy, expediency, or justice. We are not the guardians of the rights of the people of the state, unless they are secured by some constitutional provision which comes within our judicial cognisance. The remedy for unwise and oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism

[Sharpless *v.* Mayor of Philadelphia.]

of the representatives of the people. If this fails, the people, in their sovereign capacity, can correct the evil; but Courts cannot assume their rights." Chief Justice MARSHALL, in the Providence Bank Case, says: "The wisdom and justice of the representative body, and its relations with its constituents, furnish the only security, when there is no express contract, against excessive taxation, as well as against unwise legislation generally." When we come home and look into the precedents established by this Court, we find them uniformly and distinctly denying the right to go beyond the constitution. In Norris *v.* Clymer, 2 *Barr* 285, Chief Justice GIBSON, with characteristic directness of expression, declares that the constitution allows to the legislature every power which it does not positively prohibit." It was laid down in Commonwealth *v.* M'Closkey (2 *Rawle* 374), that if the legislature pass a law within the scope of their constitutional power, the judicial tribunals have no right to pronounce it void. The Commonwealth *v.* McWilliams (1 *Jones* 61), decided that express prohibition or necessary implication is essential to oust the jurisdiction of the legislature. In the very last case that came before us (Hartman *v.* The Commonwealth, 5 *Harris*), it was decided that the Assembly had jurisdiction of all cases in which its legislation was not prohibited; that the law then in question was valid, because there was no syllable in the constitution to forbid it; and that if a law, unjust in its operation, and nevertheless not forbidden by the constitution, should be enacted, the remedy lay, not in an appeal to the judiciary, but to the people, who must apply the corrective themselves, since they had not intrusted the power to us.

There is another rule which must govern us in cases like this; namely, that we can declare an Act of Assembly void, only when it violates the constitution *clearly, palpably, plainly;* and in such manner as to leave *no doubt* or hesitation on our minds. This principle is asserted by judges of every grade, both in the federal and in the state courts; and by some of them it is expressed with much solemnity of language (6 *Cranch* 87; 4 *Dallas* 14; 3 *Ser. & R.* 178; 12 *Ser. & R.* 339; 4 *Binney* 123). A citation of all the authorities which establish it would include nearly every case in which a question of constitutional law has arisen. I believe it has the singular advantage of not being opposed even by a *dictum.*

We are to inquire then, whether there is anything in the constitution which expressly or by clear implication forbids the legislature to authorize subscriptions by a city to the capital stock of a company incorporated for the purpose of making a railroad. It is admitted that there is nothing in the constitution of the United States by which this power is taken away from the legislatures of the states, unless it be a single provision, which is also found in that of Pennsylvania. (Art. 9, sec. 9). I shall consider every

[Sharpless *v.* Mayor of Philadelphia.]

part of the constitution relied on, as prohibitory of these laws, by the counsel who have addressed us either in this cause, or in the others which involve the same question.

In section 13 of article 1, it is provided, " That each house may determine the rules of its proceedings; punish its members for disorderly behavior, and with the concurrence of two-thirds, expel a member, but not a second time for the same cause, and shall have *all other powers necessary for a branch of the legislature of a free state.*" The argument deduced from this is, that the legislature can make no law which is inconsistent with the freedom of the state; that is, with the just rights and liberties of the people. But it is very manifestly meant, not to limit the powers of the General Assembly, but to confer certain parliamentary privileges on the separate branches, so that each house, when in session, could, without the concurrence of the other, promptly protect itself against indecency, disorder, corruption, or other misbehavior of members or strangers. The word *free* is to be understood of the state in her corporate capacity, and in the sense of independent or sovereign, and not of her individual citizens. If it can be construed as a restraint of legislative power, it renders the Declaration of Rights useless, and reduces all the provisions for that purpose to a single phrase. Why should particular exceptions be inserted if everything was covered by this most comprehensive restriction?

It is objected that these laws create a contract for the people of the city; and as the legislature cannot *impair* a contract, neither can they make one between parties, who do not themselves assent to it. It must be remembered that the prohibition to pass any law impairing the obligation of contracts can avail nothing unless the case comes exactly within it. The Supreme Court of the United States in Satterlee *v.* Matthewson (2 *Peters* 414), held that an act, which was retrospective in its operation and took away vested rights, was nevertheless not void under that section in the federal constitution, because it did not literally impair the obligation of a pre-existing contract. I do not say, however, that a contract between two individuals, or between two corporations, can be made by the legislature. That would not be legislation. Besides, it would be impossible in the nature of things; for the essence of a contract is the agreement of the parties. But here is no contract made or attempted to be made by the legislature, but only an authority given to the respective corporations to make one between themselves if they see proper. This authority to make contracts for and in the name of the people is given in a greater or less degree to all public corporations. It is necessary to their existence. All other corporate functions would be nugatory without it. It is constantly exercised by the supervisors of townships, by county commissioners, and by the proper officers of boroughs, districts,

[Sharpless *v.* Mayor of Philadelphia.]

and cities. Such contracts can seldom be made with the unanimous approbation of the people, but it has never been thought that a person may not be bound without his consent to perform his share of a *public* obligation. The contracts which affect a man, as an individual, must be made by himself: but those which affect him only as a member of the community in which he lives, and only in the same way that his fellow citizens are affected, must be made by the authorities which the law has set over him and them.

The eleventh section of the Declaration of Rights provides " that all courts shall be open, and every man for an injury done him in his *lands, goods*, person, or reputation, shall have redress by due course of law, and right and justice administered without sale, denial, or delay." This was clearly intended to insure the constant and regular administration of justice between man and man. To say that it is violated by refusing a judicial remedy for bad legislation, would be straining it sadly. Certainly, a contract, such as that which the defendants propose to make, however it may injure the plaintiffs, is not an injury for which they are entitled to redress if it be lawful to make it. To say that it is not lawful, and therefore injurious, is merely begging the question.

The first section of the same article enumerates among the natural rights of men, that of " acquiring, possessing, and protecting property." Undoubtedly this is a right which the legislature cannot take away. Our constitution makes property as sacred as life. But no man's right to his property can be so absolute as to exempt it from a fair share of the public burdens lawfully and constitutionally imposed. Of course we will not assume that the burden here apprehended is unlawful and unconstitutional, merely that we may make it conflict with this section. To do so, would be reasoning in a vicious circle.

It is further argued, that these laws authorize the taking of private property for public use, without just compensation, contrary to Section X. of the Declaration of Rights. It is certain that the plaintiff can expect no compensation in the proper sense of that word, as here used. It is also true, that if the railroad stocks which the city authorities are about to purchase, shall depreciate, or fail at any time to produce dividends equal to the interest on the bonds, the property of the citizens may be taxed to make up the difference. But property is not *taken* when it is merely subjected, on a future contingency, to the liability of being taxed higher than it is at present. The word *take*, is one of the commonest and plainest in the language, and cannot easily be misunderstood either by a lawyer or layman. As used in the constitution, it has universally, in this state and elsewhere, been interpreted to mean a taking altogether, a seizure, a direct appropriation, dispossession of the owner (6 *Wharton* 46; 1 *W. & S.* 225; 6 *W. & S.* 116; 1 *Barr* 314;

1 *Pick.* 418 ; 7 *Pick.* 344). We would be disregarding its popular as well as legal signification, if we would declare property to be taken when it is merely depreciated in value, or encumbered, or incidentàlly injured. Least of all is it a taking, to tax it (3 *Comstock* 419). Inasmuch as compensation is made by the constitution a necessary concomitant of all taking for public use, if we say that taxation and taking are the same, we are reduced to the absurdity of deciding that no tax can be levied for the most important purpose of the state, without an immediate re-distribution of it among the people who pay it.

The IXth Section of Art. IX. declares, that the " citizen cannot be *deprived* of his life, liberty or *property*, unless by the judgment of his peers, or the law of the land." The word " *deprived* " in this section, has received the same construction as the word " *taken*" in section X., and for reasons equally clear and strong. It cannot be said that a citizen is deprived of his property when he is left in the undisturbed possession of it, whatever taxation may be imposed on it.

It is said that this is a taking of *private* property for *private* use. If this be so, it is palpably unconstitutional. Perhaps there is nothing in the books which shows the tenacity with which this Court has adhered to the letter of the constitution in determining the extent of legislative power, more plainly than the doubt which was once entertained (10 *Watts* 63) whether the want of an express inhibition did not permit the Assembly to take one man's property and give it to another. The constitution *does* prohibit it. It is not within the general grant of legislative power. It would be a gross usurpation of judicial authority, and would violate the very words of Section XI. Art. IX. The legislature could not make such a rescript (for it would not be a law), any more than they could order an innocent man to be put to death without trial. But do the Acts of Assembly before us *take* private property for private use, or permit it to be done by the city authorities? I think I have shown that it is no taking at all.

The only substantial wrong complained of in the bill is that a public debt is about to be created for a purpose which the plaintiffs are unwilling to join in promoting; and that the debt may, and most probably will, involve the necessity of a tax, of which they must pay their share. Except for their liability to this tax, they would have no standing in Court. This is the head and front of the offending against them. But if it be imposed in pursuance of a law, passed by the supreme legislative authority of the state, and not in conflict with the constitution, it must be borne. This brings us to inquire what is the extent of the right to lay taxes.

The taxing power, being a legislative duty, is of course intrusted

to the General Assembly. And it is given to them without any restriction whatever. They are to use it according to their discretion, and if they abuse it, and if public opinion is not just or enlightened enough to correct their errors, there is no remedy. I· use the language of Chief Justice MARSHALL (4 *Wheat.* 316), when I say that it may be exercised to any extent to which the government may choose to carry it, and that no limit has been assigned to it, because the exigencies of the government cannot be limited.

But I do not mean to assert that every act which the legislature may choose to call a tax law is constitutional. The whole of a public burden cannot be thrown on a single individual, under pretence of taxing him, nor can one county be taxed to pay the debt of another, nor one portion of the state to pay the debts of the whole state. These things are not excepted from the powers of the legislature, because they did not pass to the Assembly by the general grant of legislative power. A prohibition was not necessary. An Act of Assembly, commanding or authorizing them to be done, would not be a law, but an attempt to pronounce a judicial sentence, order or decree.

It is the theory of a republican government that taxes shall be laid equally, in proportion to the nature of property; and when collected, shall be applied only to purposes in which the taxpayers shall have an equal interest. But this is impossible even in the simplest state of society, and becomes more and more difficult in proportion as a higher civilization diversifies the characters, circumstances, and the pursuits of the people. "A just and perfect system of taxation," says Chancellor KENT, "is yet a desideratum in civil government," (2 *Com.* 332.) No county or municipal tax ever came up to the theory, and the taxes now levied by the state are a grievous violation of it. The improvements made by the Commonwealth added largely to the fortunes of some, to others they did no service, and some were injured by them. Still, all are now compelled to pay for them. It is not, therefore, every inequality of burden or benefit—not every disproportion between the sum which a citizen pays, and the interest which he, as an individual, has in the purpose to which is applied—that can make a tax law void. I am of opinion with the Supreme Court of Kentucky (9 *B. Monroe* 345), that a tax law must be considered valid, unless it be for a purpose, in which the community taxed has palpably no interest; where it is apparent that a burden is imposed for the benefit of others, and where it would be so pronounced at the first blush.

Neither has the legislature any constitutional right to create a public debt, or to lay a tax, or to authorize any municipal corporation to do it, in order to raise funds for a mere *private* purpose.

No such authority passed to the Assembly by the general grant of legislative power. This would not be legislation. Taxation is a mode of raising revenue for *public* purposes. When it is prostituted to objects in no way connected with the public interests or welfare, it ceases to be taxation, and becomes plunder. Transferring money from the owners of it, into the possession of those who have no title to it, though it be done under the name and form of a tax, is unconstitutional for all the reasons which forbid the legislature to usurp any other power not granted to them.

But it has been argued (and here, perhaps, is the strain of the case), that this will be taxation for a private purpose, because the money levied will be in effect handed over to a private corporation. I have conceded that a law authorizing taxation for any other than public purposes is void; and it cannot be denied that a railroad company is a private corporation. But the right to tax depends on the ultimate use, purpose, and object for which the fund is raised, and not on the nature or character of the person or corporation whose intermediate agency is to be used in applying it. A tax for a private purpose is unconstitutional, though it pass through the hands of public officers; and the people may be taxed for a public work, although it be under the direction of an individual or private corporation. The question then, is, whether the building of a railroad is a public or a private affair. If it be public it makes no difference that the corporation which has it in charge is private.

A railroad is a public highway for the public benefit, and the right of a corporation to exact a uniform, reasonable, stipulated toll from those who pass over it, does not make its main use a private one. The public has an interest in such a road, when it belongs to a corporation, as clearly as they would have if it were free, or as if the tolls were payable to the state, because travel and transportation are cheapened by it to a degree far exceeding all the tolls and charges of every kind, and this advantage the public has over and above those of rapidity, comfort, convenience, increase of trade, opening of markets, and other means of rewarding labor and promoting wealth. In Bonaparte *v.* The Camden and Amboy Railroad Company (1 *Baldwin* 223), although the charter of the defendants had more features in it of a close monopoly for the mere private emolument of the stockholders, than any other similar company in the country, yet the road was held to be a public work, and the plaintiff's land, taken to build it on, was decided to have been taken for public use.

It is a grave error to suppose that the duty of a state stops with the establishment of those institutions which are necessary to the existence of government; such as those for the administration of justice, the preservation of the peace, and the protection of the

[Sharpless *v.* Mayor of Philadelphia.]

country from foreign enemies; schools, colleges, and institutions, for the promotion of the arts and sciences, which are not absolutely necessary, but highly useful, are also entitled to a public patronage enforced by law. To aid, encourage, and stimulate commerce, domestic and foreign, is a duty of the sovereign, as plain and as universally recognised as any other. It is on this principle that the mint and post-office are in the hands of the government; for they are but aids to commerce. For the same reason we maintain a navy to keep open the highway of nations. It was·a commercial restriction which caused the revolution, and injuries to our trade which produced the subsequent war against England, with all its expense of money and blood. Canals, bridges, roads, and other artificial means of passage and transportation from one part of the country to the other, have been made by the sovereign power, and at the public expense, in every civilized state of ancient and modern times. I need not say how much of this has been done in Pennsylvania; but if the works erected by the Commonwealth for the promotion of her commerce, are not public improvements, then every law relating to them is void; every citizen may repudiate his share of the state debt, if he pleases, and defend his property by force against a collector of state taxes.

It being the duty of the state to make such public improvements, if she happen to be unable or unwilling to perform it herself to the full extent desired, she may accept the voluntary assistance of an individual, or a number of individuals associated together and incorporated into a company. The company may be private, but the work they are to do is a public duty; and along with the public duty there is delegated a sufficient share of the sovereign power to perform it. The right of eminent domain is always given to such corporations. But the right of eminent domain cannot be used for private purposes; and therefore if a railroad, canal, or turnpike, when made by a corporation, is a mere private enterprise, like the building of a tavern, store, mill, or blacksmith's shop, there never was a constitutional charter given to an improvement company, and every taking of land or materials under any of them, was a flagrant trespass.

If the making of a railroad is a public duty, which the state may either do entirely at the public expense, or cause to be done entirely by a private corporation, it follows that such a work may be made partly by the state, and partly by a corporation, and the people may be taxed for a share of it, as rightfully as for the whole. The corporation may be aided by an exertion of the taxing power, as well as with the right of eminent domain. Accordingly we find that from the earliest times the Commonwealth has subscribed to the stock of such corporations, and paid over the money to them in pursuance of laws which no one ever doubted to

[Sharpless *v.* Mayor of Philadelphia.]

be constitutional.    Many millions of the state debt have been created in that way.

Now, if the legislature may create a debt and lay taxes on the whole people to pay for such subscriptions, may they not, with more justice and greater propriety, and with as clear a constitutional right, allow a particular portion of the people to tax themselves to promote in a similar manner a public work, in which they have a special interest?    I think this question cannot be answered in the negative.    It will surely not be pretended that all taxes are unconstitutional, which are not laid by the state directly, which are not general, or which do not go into the state treasury.    If this could be maintained it would make our general road law unconstitutional from beginning to end.  . Counties and townships have always had the right given to them, and the duty cast upon them, of erecting their own public buildings, and making their own roads.    Local taxes for local purposes, and general taxes only for purposes which concern the whole state, are a vital principle of our political system, and there is no feature in it which has attracted more unqualified admiration from those who understand it best.    Its justice is too obvious to need explanation.    I cannot conceive of a reason for doubting that what the state may do in aid of a work of general utility, may be done by a county, or a city, for a similar work which is especially useful to such county or city, provided the state refuses to do it herself, and permits it to be done by the local authorities.;

The city's charter was granted by the legislature.    It may be enlarged.    The same power which gave them the privileges which they have, may give them others.    It cannot be so enlarged as to enable the corporate authorities to embark the city in a private business, or to make the people pay for a thing in which they have no interest.    But within these limits there is nothing to prevent an indefinite extension of their corporate powers.

But it is insisted that the right of a city or county to aid in the construction of public works, must be confined to those works which are within the locality whose people are to be taxed for them.    The Water-Gap Company stops its road north of Vine street, outside of the city limits, and the Hempfield road has its eastern terminus at Greensburg, three hundred and forty-six miles west of Philadelphia.    I have already said that it is the *interest* of the city which determines the right to tax her people.    That interest does not necessarily depend on the mere location of the road.    Therefore the location cannot be an infallible criterion.    If the city cannot have an interest in a road which stops in the Northern Liberties, then Dock Ward can have no interest in one which terminates in Upper Delaware Ward, and all the subdivisions of the city, which it does not actually enter, may be exempted on the same score.    A railroad may run through a county without doing its

inhabitants the least service. May such a county assist to make it, while a city which it supplies with bread and whose trade is doubled by it must not do so, merely because it ends outside of an imaginary line that limits the corporate jurisdiction? It seems very plain that a city may have exactly the same interest in a road which terminates outside of her borders, as if the depot were within them, and a great deal more than if it passed quite through. If she has an interest in any part, she has probably an equal interest in every part. Railroads are generally made to connect important trading points with each other. The want of a link at one place breaks the desired connexion as much as at another. Philadelphia has now a road to Greensburg. The Hempfield Company proposes to carry it on to Wheeling. I do not see that the city is not as much interested in the Hempfield road as she would be in making an independent road, starting at the corner of Schuylkill Fifth and Market streets, and running by way of Greensburg the whole distance to Wheeling.

But it is not our business to determine what amount of interest Philadelphia has in either of these improvements. That has been settled by her own officers, and by the legislature. For us it is enough to know that the city may have a public interest in them, and that there is not a palpable and clear absence of all possible interest perceptible by every mind at the first blush. All beyond that is a question of expediency, not of law, much less of constitutional law. We would certainly be exercising a novel jurisdiction, if we would listen to an appeal from the councils on a point of local policy, and we would be giving a novel judgment, too, if we would decide a statute to be unconstitutional, because the corporate authorities of a city, in acting under it, mistook the true interest of their constituents.

We must take it for granted that the councils and the Mayor have fairly represented the majority of their constituents. It may operate with great hardship on the minority, but in this country it is private affairs alone, and not public, that are exempt from the domination of majorities. It may be conceded that the power of piling up these enormous public burdens, either on the whole people, or on a portion of them, ought not to exist in any department of a free government; and if our fathers had foreseen the fatal degeneracy of their sons, it can scarcely be doubted that some restriction on it would have been imposed. But we, the judges, cannot supply the omission.

I will conclude with a recapitulation of the points and principles which I think settle the case.

1. In determining whether an Act of the legislature is constitutional or not, we must look to the body of the constitution itself, for reasons. The general principles of justice, liberty, and right,

[Sharpless *v*. Mayor of Philadelphia.]

not contained or expressed in that instrument, are not proper elements of a judicial decision upon it.

2. If such Act be within the general grant of legislative power, that is, if it be in its character and essence a law, and if it be not forbidden expressly or impliedly, either by the state or federal constitution, it is valid.

3. To make it void, it must be clearly not an exercise of legislative authority, or else be forbidden so plainly as to leave the case free from all doubt.

4. An Act of Assembly, authorizing a subscription by a city to the stock of a railroad corporation, is not forbidden by art. 1, sect. XIII. of the state constitution; that section not being a restriction upon the legislative authority of the two houses, but a bestowal of privileges upon the separate branches.

5. Such an Act does not impair the obligations of any existing contract, nor does it attempt the impossibility of creating a contract, but merely authorizes two corporations to make one if they shall see proper.

6. This is not such an injury to the plaintiffs' lands, goods, or persons, that they are entitled to a judicial remedy for it, agreeably to sect. XI. of art. 9. It is no injury at all, except on the gratuitous assumption that it is forbidden in some other part of the constitution.

7. It does not violate the right of acquiring, possessing, and protecting property, secured by sec. I. of art. 9. The right of property is not so absolute but that it may be taxed for the public benefit.

8. This is not a taking of private property for public use, without compensation, contrary to sec. 10 of art. 9. When property is not seized, and directly appropriated to public use, though it be subjected in the hands of the owner to greater burdens than it was before, it is not *taken*.

9. It cannot be said that the plaintiffs will be deprived of their property, in violation of sec. IX. of art. 9. The settled meaning of the word *deprive*, as there used, is the same as that of the word *take* in sec. X.

10. An act of assembly to authorize the taking of private property for *private* use, would be unconstitutional, because it would not be legislation, but a mere decree between private parties. But this is no taking in any sense, for any purpose or for any uses.

11. The plaintiffs have no ground of complaint against the acts of assembly now in question, except because they authorize the creation of a public debt, of which they may be required hereafter to pay a part in the shape of taxes. By taxation alone can any harm ever come to them.

12. If it be within the scope of legislative power, with the con-

[Sharpless *v.* Mayor of Philadelphia.]

sent of the local authorities, to permit the assessment of a local tax, for the purpose of assisting the corporation to build a railroad bearing to the tax payers the relation which these railroads do, then the laws complained of are unobjectionable.

13. Taxation is a legislative right and duty, which must be exercised by the general assembly, or under the authority of laws passed by them.

14. The power of the assembly, with reference to taxation, is limited only by their own discretion. For the abuse of it, members.are accountable to nobody but their constituents.

14. By taxation is meant a certain mode of raising revenue for a public purpose in which the community that pays it has an interest. The right of the state to lay taxes has no greater extent than this.

16. An Act of the legislature authorizing contributions to be levied for a mere private purpose, or for a purpose which, though it be public, is one in which the people from whom they are exacted have no interest, would not be a law, but a sentence commanding the periodical payment of a certain sum by one portion or class of people to another. The power to make such order is not legislative, but judicial, and was not given to the assembly by the general grant of legislative authority.

17. But to make a tax law unconstitutional on this ground, it must be apparent at first blush, that the community taxed can have no possible interest in the purpose to which their money is to be applied. And this is more especially true, if it be a local tax, and if the local authorities have themselves laid the tax in pursuance of an Act of Assembly.

18. If, therefore, the making of a railroad be a mere private affair, or if the people of Philadelphia have manifestly no interest in the railroads which run to and towards the city from Easton and from Wheeling, then these laws are unconstitutional.

19. But railroads are not private affairs. They are public improvements, and it is the right and duty of the state to advance the commerce, and promote the welfare of the people by making, or causing them to be made at the public expense.

20. If the state declines to make a desirable public improvement, she may permit it to be done by a company, and the fact that it is made by a private corporation, does not take away its character as a public work.

21. The right of the company by which it is made, to be compensated for the expense of constructing it, by taking tolls for its use, though it gives the corporation an interest in it, does not extinguish the interest of the public, nor make the work a private one; because to say nothing of other advantages, the public can

[Sharpless *v.* Mayor of Philadelphia.]

pay the toll, and still carry and travel on it very much cheaper than without it.

22. The state may, therefore, rightfully aid in the execution of such public works, by delegating to the corporation the right of eminent domain, as she always does, or by an exertion of the taxing power as she has done very often.

23. The right of the legislature, with the consent of the local authorities, to tax a particular city for a local improvement is as clear as the right to lay a general tax for any purpose whatsoever.

24. The state having the constitutional power to create a state debt by a subscription on behalf of the whole people to the stock of a private corporation engaged in making a public work, it follows from what has been before said, that she may authorize a city or district to do the same thing, provided such city or district has a special interest in the work to be so aided.

25. This is not a case in which we can determine as a matter of law that the city has no interest in the proposed railroad. That this is true as a matter of fact, has not even been asserted in the argument.

26. The legislature and the councils have decided that the city has an interest large enough to justify the subscription ; we cannot gainsay this, without declaring all interest to be flatly impossible, and to do that would be absurd.

27. Finally : the authorities of the city, in accordance with the charter, and with certain laws supplementary thereto, are about to create a public debt for a public purpose in which the city has an interest. It will be as valid and binding as if it had been legally contracted to accomplish any other public purpose for the benefit of the city.

If the judgment we are about to give should be wrong, it will be our fault, for we have been well assisted. Three causes, involving the same question, were heard in immediate succession, and were argued with an ability fully proportioned to the immense magnitude of the interests, public and private, which were at stake. I do not propose to shift any part of the responsibility upon our predecessors, or upon the judges in other states, who have heretofore decided the question, and therefore I have examined it as if it were a case of the first impression; but it would be wrong to close without saying that the conclusion here reached is sustained by the highest tribunals in Virginia, (8 *Leigh* 120); New York, (24 *Wendell* 75); Connecticut, (15 *Conn.* 75); Tennessee, (9 *Humph.* 152); Kentucky, (9 *B. Monroe* 256); Illinois, (5 *Gilman* 405); and Ohio (unreported.) These cases are entitled to our highest respect. In most of them, and especially the later ones, the subject is very ably discussed, and they are a manifest triumph of reason

and law over a strong conviction in the minds of the judges that the system they sustain was impolitic, dangerous, and immoral. Besides these, we have a case in our own books, (1 *Jones* 61), which cannot be distinguished from this, and which ought to have something more than respect. We owe it the deference due to a declaration of the law, made by ourselves, on the faith of which the people in this and other states have invested millions of money.

I am of opinion that the motion for a special injunction ought to be refused.

WOODWARD, J.—The acts of Assembly whose constitutionality is drawn in question, were approved on the 6th day of May, 1852, and the 9th of April, 1853, respectively. By the first, the constituted authorities of the city of Philadelphia, the incorporated districts in the county of Philadelphia, the borough of Easton in the county of Northampton, and the counties of Monroe and Pike, or either of them, are authorized to subscribe for shares in the capital stock of the "Philadelphia, Easton, and Water Gap Railroad Company," provided that no subscription by any municipal corporation, authorized by this section to subscribe to the capital stock of said company, shall exceed ten per cent. on the assessed valuation of the real and personal estate in the city, district, borough, or county making such subscription. By the other of these acts, the city of Philadelphia is authorized to subscribe for 10,000 shares in the capital stock of the Hempfield Railroad Company, and "the said city may be represented at elections and other meetings of the said company by agents duly authorized to act, by resolutions of the councils thereof." To enable the city to pay for these stocks, both acts empower the city "to borrow money to pay therefor, and to make provision for the principal and interest so borrowed, as in other cases of loans to said city."

By an ordinance of the city councils, passed in the forms of the charter, on the 10th of March, 1853, the Mayor was authorized, on certain conditions, to subscribe for 10,000 shares in the capital stock of the Philadelphia and Water Gap Railroad Company; and by a similar ordinance of the 4th of April, 1853, he was authorized, unconditionally, to subscribe for 10,000 shares in the capital stock of the Hempfield Railroad Company, which he did on the 10th of May, 1853.

To restrain the city authorities from making these subscriptions, and from issuing bonds, if already made, the relators, who are citizens and owners of real and personal estate in the said city, apply to this Court for a writ of injunction. The city pleads the authority of the acts of Assembly for the subscriptions. The relators allege that these acts are unconstitutional and void. This is the issue on the record.

It is material to observe, that neither of the Railroads are within the city of Philadelphia. The first named begins at a point north of Vine street, which is the northern boundary of the city, and runs by the most expedient and practicable route, to or near the borough of Easton, and thence, by various authorized connections and extensions, to a point called Waverly, on the New York and Erie Railroad, where it touches the northern boundary of the state, in the county of Bradford.

The Hempfield Railroad was incorporated to be laid with one or more tracks from Greensburg, in Westmoreland county, where it intersects the Central Railroad, to some point near to West Newton, in said county, and thence by authorized connections and extensions through Washington county, Pennsylvania, and Ohio county, Virginia, to the city of Wheeling. This road is said to be, at its nearest point, three hundred miles from the city of Philadelphia. It must be assumed, that the design of one of these roads was to facilitate trade and commerce between the city of Philadelphia and the northern portions of Pennsylvania and New York; of the other, to bring increased trade and travel on the Central Railroad, in which the city of Philadelphia owns $4,000,000 of stock, as well as to establish a direct communication between the said city and the valley of the Ohio at the city of Wheeling.

Though it is possible to imagine that the city of Philadelphia might be able to make provision for the payment of the loans, authorized by these acts of Assembly, out of rents of property, dividends on stocks, exchange or sale of stocks, legacies, and such like resources; yet taxation was the power evidently intended to be conferred. The question, therefore, which we have to decide, may be stated thus: *Had the legislature constitutional power to authorize the city of Philadelphia to subscribe for stock in these railroad companies; to borrow money to pay the subscriptions, and to levy taxes to pay the loans?*

We make considerable progress in the discussion of any question by stating it properly. From the statement of the present question, it is apparent that some matters which entered largely into the discussion at bar, have no necessary connection with it. The *policy* of such legislation is in no degree a question for the judiciary. That belongs exclusively to the people and their representatives. Nor have the doctrines of *eminent domain* anything to do with the question before us. It is said there are but two modes under our constitution, in which the public may take private property—the one, by virtue of what is called *eminent domain*, when compensation is secured by the constitution—the other by taxation, when compensation is unprovided for, except what results incidentally from a republican form of government.

I do not agree with one of the learned counsel in the West

VOL. IX.—23

Chester case, who argued that there is no distinction between *eminent domain* and *taxation.* I think there is. Both are exercises of sovereignty, it is true, but the former has respect to the property of individuals, and is regulated only by the public exigencies, whilst the latter respects the whole community, or whole classes of individuals, and is regulated by some standard prescribed by law. Again, when private property is taken for public use, compensation must be made, and that must be in money, and cannot be in kind, Vanhorn's Lessee *v.* Dorrance, 2 *Dallas;* Sutton's Heirs *v.* the City of Louisville, 5 *Dana* 29. Money, said Lord MANSFIELD, is the measure of value. In some sense money is property, but when our constitution requires compensation in *money* to be made for *property* taken for public use, it marks a distinction between money and property—between value and its measure. But taxation is a public demand, not for *property* in the sense of the constitution, but for money, or personal services, and that without compensation. True, under most tax laws, property may be seized and sold for default of payment in money, but this only as means to an end, just as the body may be imprisoned if property cannot be found. Nor are these distinctions disproved by the instance put in argument, of money seized to pay troops on the point of mutiny in the face of an invading foe, when it was said, if compensation be made it must be in kind. The answer is, that such a seizure would be neither the exercise of *eminent domain,* nor of the power of taxation, but of martial law. In adequate emergencies, martial law suspends the habeas corpus, inflicts summary punishments, and appropriates private property, without regard to the guaranties of the constitution. *Inter arma silent leges.* But in the operations of *civil* government, the legislature exercises its constitutional sovereignty, sometimes in taking specific property from individuals for a price and devoting it to public use, and sometimes by imposing a tax on property without change of its title or its use.

What we have to deal with here, then, is the *constitutionality of laws for taxation,* and all those clauses of the constitution, and all the arguments of counsel which apply to legislation founded on the *eminent domain,* are beside the point, and may be laid out of the discussion.

Do I take undue liberty with the question, in thus shearing it of much matter which distinguished counsel supposed pertained to it? Are they not tax laws? The words of the enactments, as we have seen, import taxation. The complainants so understand them, for they tell us they are "bound by law, and do pay all taxes justly assessed and levied on their property in the city of Philadelphia," and they charge that by said subscriptions and the issuing of said bonds, "the debt of said city, now exceeding seven

millions and a half of dollars, would be greatly increased, the credit thereof seriously impaired, and *the taxes chargeable and to be levied in the said city upon the property of your orators and their fellow citizens, will be greatly augmented.*"

Beside, if these acts affect city property at all, it must be through taxation, for the specified roads are not to touch the city, nor to "*take*" an inch of its property, within the meaning of the tenth section of the bill of rights. Taking private property, and applying it specifically to public objects, is one thing—assessing property with public taxes according to a pre-determined standard, is quite another thing. These acts mean the latter, and not the former, if their words be regarded; if the interpretation of the complainants be received, or if the distinctions of the constitution between eminent domain and taxation be not obliterated.

Considering, therefore, these Acts of Assembly as providing for objects which are to be attained through taxation, I next proceed to notice briefly the principles on which the constitutionality of such legislation is to be tested.

The striking peculiarity in the civil and political condition of the people of this country, is that they live under the jurisdiction of two separate and distinct governments—both formed by themselves, and the powers of each limited by written constitutions. The people of Pennsylvania, made absolutely free, sovereign, and independent, on the 4th day of July, 1776, settled for themselves a frame of government which, as modified in the present constitution, organizes the various departments of a republican government, legislative, executive, and judicial; and vests in them, not specific and enumerated powers, but *legislative power, executive power, and judicial power.* Whatever is in the nature of these three governmental powers, (and for their nature we must refer ourselves to the principles of political science,) belongs to these departments respectively, but not without limitations. The bill of rights is a series of reservations out of the powers granted to these departments, and concludes with a solemn declaration in these words: "To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government, and shall for ever remain inviolate." The primary questions, therefore, that arise upon the constitutionality of an Act of Assembly, are first: Is it in the nature of legislative power; and secondly, does it trench upon any of the reservations in the bill of rights? If the first of these questions can be answered affirmatively, and the other negatively, the resulting conclusion is that the Act is constitutional. So far in regard to the state constitution.

The federal constitution sprung from the experienced necessities of the states of the confederacy, and was formed out of powers

[Sharpless *v.* Mayor of Philadelphia.]

specifically granted and enumerated by the people.    To the extent of the powers granted, this instrument restrains the sovereignty of the states, but the "powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people."    Because the people are more largely represented in the state government than in the national; and because the powers granted to the federal government are in derogation of state rights, the rule of strict construction, as applied to these grants, is obviously conservative and just, though not universally admitted.

The people are the source of all political powers.    They enumerate those they *grant* to the federal government, and those they *reserve* from the state government.    The legislative power of the states extends to all subjects, properly legislative, not found in one or the other of these enumerations, and the only question additional to those already stated, that can arise on the constitutionality of a state law, is, does it contravene the grants in the federal constitution ?

But this question need not be considered here, for in all that has been said against these Acts of Assembly, they have not been charged with contravening any of the grants in the constitution of the United States.

Recurring, therefore, to the questions stated, I proceed to inquire, first, whether these Acts of Assembly are according to the nature of legislative power.

That taxation is a legislative power has never been questioned in this country.    In despotic governments it is usurped by the supreme executive, and in the limited monarchy of Great Britain it has sometimes been exercised by the king, but always with popular discontents; and in the instance of Charles the First, it led to the loss of his head.    The people have long since regained this right, and it is now vested in parliament.

Here it was claimed for our colonial legislatures against the legislative body of the mother country, where we were unrepresented; and as soon as the people became free, they brought it as near home to themselves as possible, by providing in all their constitutions that *revenue bills* should originate in the House of Representatives, where they are most largely and directly represented. Yet, there is nothing about this power in our constitution, except what is implied from the provision just referred to.    Government presupposes the power of taxation, and cannot exist without it; and because it is not denied in the bill of rights, it is granted in the general grant of legislative power.    In the federal constitution it is expressly given to the legislative body.    This indicates at once the distinction in the theory of the two constitutions, and the sense of the country that taxation is a legislative power.

But it is said that this power cannot be delegated. Strictly speaking, none of the powers of government can be delegated. They are vested in co-ordinate departments to be exercised, and without the right of transfer. But the legislature may provide agencies through whom to exercise the power of taxation, and that is not properly called a delegation or transfer of the power, which is merely an exercise of it through a suitable agent. Accordingly, from the beginning of our government, the legislature have divided the state into counties, townships, school districts, boroughs, and cities, and have provided for the appointment or election of certain tax officers, in their respective localities, and have authorized them to assess, collect, and apply taxes. This has been not so much a delegation of the power of taxation to those municipal divisions as the exercise of it through and by means of chosen agencies. In exact accordance with this kind of legislation, which, having been coeval with the constitution, affords the best interpretation of it, these Acts of Assembly authorize one of the municipal districts of the state "to make provision for the payment of the money borrowed, as in other cases of loans to said city." Was this a delegation of a legislative function? How could the legislature make provision for the repayment of the borrowed money, as in other cases of loans to said city? Their faculties are all legislative. They have no executive power, and the constitution and habits of the body unfit them for applying rules which it is their province to prescribe. They are obliged to act through chosen agencies when providing for the revenues of the state. State taxes, the internal improvement system, common schools, and all state objects, have to be intrusted to agents, though the power that controls them resides in the legislature. In the same manner, when the legislature would tax the citizens of the city of Philadelphia, to build the railroads in question, they must use the hand of some agent, and whose could be more wisely selected than that of the "constituted authorities" of the city? And even that hand is not forced to the work, but employed only with the consent of the body to which it belongs—a circumstance which indicates the moderation of this legislation.

But the objection most insisted on has reference not to the legislative power of taxation, nor to the agencies called in aid of its exercise, but to the *objects* and *purposes* to which it is applied. These are to construct railroads outside of the geographical limits of the city. Whilst the constitutional power of the legislature to create, renew, and extend the charters of municipal corporations is admitted, it is maintained that *municipal administration* is the only purpose for which they exist; and it is denied that legislative power can tax them for any other.

By subscribing to the stock of these railroad companies, the city

of Philadelphia will become a member of the companies. They are private corporations. Intending to become common carriers, they will assume large responsibilities, a share of which must fall on each corporator. The enterprise is costly and hazardous, and may result in great pecuniary profits, or in disastrous losses. Is it a municipal purpose? Does it come within the circle of objects which municipal corporations were designed to accomplish? Without going into the history and common law of such corporations, I unhesitatingly answer these questions in the negative. There is no congruity between such an enterprise and the legitimate purposes of municipal corporations. They were designed to regulate the internal affairs of the places in which they were located. Police, health, streets, lanes, alleys, and the like, are the appropriate subjects of municipal administration; and though a city may go beyond its boundaries to purchase necessaries for its existence, safety, and comfort, yet its jurisdiction is properly exercised only within its territorial limits, and on subjects that pertain to its domestic economy and well-being. Railroads, to connect distant points of country, to develope physical resources, and to promote commerce, are great public benefactions, and emphatic expressions of the energies of an age distinguished for activity and bold adventure. But they come not within or near that class of objects which we have been taught to consider as municipal purposes. Yet when the legislature enables a city to lend a hand to such enterprises, where is the *constitutional* provision which the judiciary can say is violated? The power of taxation is unrestrained in the constitution, both as to extent and purpose. Municipal corporations are not defined in the constitution, nor in any general statute. If we go to the common law, that teaches us they may be formed by prescription, by statute, or by royal charter, and that their ordinary purposes are such as I have indicated; but it imposes no restraints on legislative power in respect to them. On the contrary, a learned writer informs us that "in England the legislature has not often exercised the power of creating municipal corporations, because it has been esteemed a flower of the prerogative. Where the ordinary regulations alone are necessary, the king incorporates by charter; but when it is thought proper to invest the intended body with any *extraordinary* power or privilege, the aid of parliament is necessary." Again: "The statute may invest the body with powers contrary to the general rules of law, but they must be granted in clear and unambiguous words." Again, he says: "It is quite unnecessary to say what privileges may be granted, or regulations prescribed to a corporation by an Act of Parliament, *for the power of the legislature in this respect cannot be defined.*" (*Willcock on Municipal Corporations*, sect. 10, 19, and 226.)

[Sharpless *v.* Mayor of Philadelphia.]

Without saying that with us this power *cannot* be defined, it must be admitted it has not been. The people alone are competent to set bounds to a clearly granted and unquestionable power. The judiciary cannot assign limits to that which the people have decreed shall be unlimited. If they could, the judiciary would be the only real sovereign in the state, and might hinder the most salutary legislation. Are we to set aside these enactments, because they do not harmonize with our ideas of municipal purposes? This is the most solid ground to which we have been pointed, but it is not strong enough to sustain such a decree.

I have no doubt of the right and duty of the judiciary to declare a law unconstitutional, when it clearly contravenes any of the provisions of the state or federal constitutions; but it is a power to be exercised with great caution. For nearly fifty years of our political existence, under the constitution of 1790, no Act of Assembly was set aside for unconstitutionality. Judges claimed the power, and said they would exercise it in clear cases, but in all that period no case arose which, in their judgment, was clear enough to justify the exercise of the power; and it is well known that that great light of this bench, so recently extinguished, stood opposed, for many years, to the *existence* of any such judicial power. Since the constitution of 1838 was adopted, several Acts of Assembly have been declared unconstitutional, but they were all clear cases. When the legislature disregards the distribution made of the powers of government, among the three co-ordinate departments—or the restrictive clauses in the body of the instrument—or the reservations of the bill of rights—or the grants to the government of the United States—the judiciary, whose office it is to expound the law, may, and I hold are bound to declare the act unconstitutional and void. But on lower ground than this, and especially on ground so low, as the equivocal and undefined purposes of municipal corporations, Acts of Assembly have never been declared unconstitutional. It was said in the argument, and authorities were exhibited to prove that the constitutionality of legislation, similar to this we are considering, has been asserted in seven states of the confederacy. These concurring opinions of the Courts around us, sitting under state constitutions similar in their structure to ours, are entitled to great respect, and serve to show that the corrective of this species of legislation, novel as it unquestionably is, and pernicious, as many believe, is with the people and not with the courts.

The power of legislation by representatives of their own choosing, is one of the invaluable privileges of the people. It is this which makes them a free state. This is self-government—the best of all kinds of government, and therefore least in need of clogs and restraints. When, through inadvertence, this power is applied to

objects forbidden by the letter of the constitution, the interposition of the judicial arm is properly invoked. But so long as it keeps within its appointed orbit, judges cannot interfere with its progress, without themselves departing from their proper sphere.

It remains to consider briefly the second question proposed: Does this legislation trench on the Bill of Rights? The first section of that instrument is relied on, which enumerates among the inherent and indefeasible rights of man, that of "acquiring, possessing, and protecting property."

It must never be forgotten that the "Declaration of Rights," as the 9th article of our constitution is called, is part of a frame of civil government, and is to be construed with reference to the whole instrument, of which it is a part. When, therefore, "the right of acquiring, possessing, and protecting property," is asserted, it does not mean to exempt property from taxation, since without taxation civil government cannot exist. Nor does it mean to exempt it from the prerogative of *eminent domain,* for the right to take private property for public use, is elsewhere expressly asserted, and without this also government cannot exist prosperously, if indeed at all. The acquisition, protection, and defence guaranteed, must be consistent with and subordinate to these first principles, else one part of the constitution destroys the other, and so the government is dissolved. I am clearly of opinion, that this section cannot be set up against a tax law. Nor is there any clause in the Declaration of Rights, which restrains the legislative power of taxation. I know this may seem to some a startling proposition, but, rightly considered, there is nothing alarming in it.

The great conservative principle which lies at the base of our institutions, is popular representation, and it was, doubtless, a profound reliance on this principle, which induced the framers of our constitution to plant in the legislature the taxing power without stint or restraint. And as the tree is best known by its fruits, so are the results of experience the best tests of political theories. In those governments where suffrage and representation have been withheld from the masses, men and property have been taxed to support royalty and aristocracy in costly magnificence—to carry on wars bred by the bad passions of rulers, or to construct expensive and useless works as memorials of individual grandeur. How different with us! Taxation by the general government, indirectly applied, is limited to the necessities of economical administration. Taxation in Pennsylvania, beyond the ordinary purposes of government, has been devoted to the education of the ignorant, the relief of the insane, the dumb, the blind:—to the construction of highways, and bridges. and canals, and railroads. These are the purposes to which a REPUBLICAN GOVERNMENT applies the power of taxation, and when so applied, it is a beneficent power. Even

[Sharpless *v*. Mayor of Philadelphia.]

though incongruously blended with municipal purposes, as in the instances before us, it is by no means clear that it will not be productive of more good than evil. And that it will never be long perverted to injurious use, is as certain as the law of self-preservation, for so long as the people rule themselves, it is impossible to anticipate that they will employ any of the powers of government for their own oppression. The fact is, the internal improvements of Pennsylvania, ill-contrived and badly managed as in some instances they have been, have added incalculably to the material wealth of the state, and the taxation they have occasioned, if it seem high as compared with former standards, sinks into insigificance when compared with taxation in other countries, or with the resources of national wealth and greatness which it has multiplied in our own. It is easy to imagine possible abuses of any unrestricted power, but the voice of our own experience (and I know no safer oracle) teaches us that we may safely trust the interests of the future to that form of government which has been productive of so much happiness and prosperity in the past.

But, not to pursue the subject further, my opinion is, that upon the received principles of constitutional construction, these Acts of Assembly are constitutional and not void, and consequently that the motion for an injunction should be denied.

Knox, J.—The right of this Court to declare an Act of the legislature unconstitutional, is unquestionable, and I may safely add, unquestioned. It is equally plain that this right should only be exercised in cases free from doubt or difficulty. The presumption is that the legislature has judged correctly of its own constitutional powers, and the contrary must be clearly demonstrated before a co-ordinate branch of the government can be called upon to interfere between the people and their immediate representatives. The authorities cited by the counsel for the respondents, prove that this rule is recognised by the Courts of several of our sister states, and it is the language uniformly spoken by our own judges.

In ascertaining whether there has been this clear usurpation by the law-making power, I agree with the Chief Justice, and Mr. Justice Woodward, that the tests to be applied are : 1st, Is the Act in the nature of a legislative power ? 2d, Does the constitution expressly, or by necessary implication, forbid the exercise of such a power?

The two questions are closely assimilated. If it is not in the nature of a legislative power, the constitution does, by necessary implication, forbid the General Assembly from exercising it. All attempts upon the part of the legislature to exercise the class of powers committed to the care of the judiciary, are clearly un-

authorized and unconstitutional. For there is a necessary implication arising from the organization and recognition of the judicial branch of the government, that its authority shall be supreme, and its jurisdiction exclusive, upon subjects committed to its care and upon questions to be determined by its judgment. Hence the legislature cannot lawfully grant a new trial in a case once determined. This Court might, with equal right, declare that a bill which had passed through all the forms of legislation, should again be submitted to a vote of the Senate and House of Representatives, and presented to the executive for his approval or rejection, as for the legislature to say that a verdict of a jury, and the judgment of a Court, should be set aside, in order to give the parties litigant another opportunity to ascertain where right and justice belong.

It is unnecessary to multiply instances or words, to prove that the legislature cannot rightfully exercise judicial or executive authority. It is confined to its own sphere of action, separate and distinct from the other departments of the government. Its powers, although limited, are so extensive and varied, that it was not thought consistent with the conciseness and brevity of the constitution to enumerate them in detail. That the creation of a municipal corporation, or the enlargement of its powers subsequent to its origin, is the exercise of a legislative power, is too plain for argument.

To what extent can its powers be enlarged, and what additions may be made to the original purposes for which it was created; or in other words, how far may the legislature go in the exercise of a legislative power? I submit that there is no limit to this authority until it is met by the mandate of the constitution, "Thus far, but no farther." I am aware that under this rule acts may be passed which will, in the minds of many persons, be contrary to natural justice, and subversive of the just rights of the people. The remedy is to be found in further constitutional restrictions upon legislation, not in restraints imposed by the judiciary. The limit of the power of the people's representatives, in my judgment, should be written upon the pages of the constitution, rather than remain in the breast of our judges.

There is, to my mind, great danger in recognising the existence of a power in the judiciary to annul legislative action, without some fixed rule by which such power is to be measured. Our opinions are so diversified and varied, that what to one mind may seem clearly right and proper, to another will appear to be fraught with imminent danger. If we have not a certain standard by which to test the constitutionality of legislative enactments; if each judge is to be governed by his own convictions of what is right or otherwise, I fear that restraints upon judicial, rather than

[Sharpless v. Mayor of Philadelphia.]

upon legislative action, will be demanded by a people ever jealous of the accumulation of power in the hands of the few.

From whence is derived the power of the judiciary to declare unconstitutional an act of legislation? Is it not because of the supremacy of the organic law, and the sworn duty of judges to maintain it? If this law is not written, who shall declare its existence?

I cannot find in the letter of the constitution any prohibition against the enactment of the law in question. To me it is satisfactorily shown by my brethren with whom I agree in this case, that the provision against taking private property for public use, without compensation, cannot, by fair construction, be made to embrace the point at issue. I cannot strengthen the argument by repetition, and shall not attempt it, but will simply add that I concur with them in saying that this is not the exercise of the right of eminent domain, but that of taxation. The right to tax persons and property must necessarily exist in the legislature, and the restraint upon its use is to be found in the accountability of the members thereof to their constituents.

In the language of Chief Justice MARSHALL, in McCullough v. Maryland, 4 *Wheaton* 428: "The only security against the abuse of this power, is found in the structure of the government itself. In imposing a tax the government acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation. The people of a state, therefore, give to their government the right of taxing themselves and their property, and as the exigencies of the government cannot be limited, they prescribe no limit to the exercise of the right, resting confidently on the interest of the legislature, and the influence of the constituents over their representatives to guard them against its abuse."

It is said that taxation, when unequal, is unconstitutional, and that although the whole people may lawfully be taxed for a particular purpose, such as constructing a railroad or other improvement, those inhabiting a particular locality cannot be taxed to the exclusion of the remainder. This is in the very teeth of the decision of this Court in Kirby v. Shaw, 7 *Harris* 258. GIBSON, J., in delivering the opinion of the Court, says: "But it is a postulate of a state constitution, which distinguishes it from the federal, that all the power of the people is delegated by it, except such parts of it as are specifically reserved; and the whole of it is without exception vested in the constitutional dispensers of the people's money. As regards taxation, there is no limitation of it. Equality of contribution is not enjoined in the bill of rights, and probably because it was known to be impracticable." And again, "The sum of the matter is that the taxing power must be left to that part of the government which is to exercise it."

[Sharpless *v.* Mayor of Philadelphia.]

The argument that the legislation authorizing these subscriptions contravenes the bill of rights, is not sustained. There is in the bill of rights no limitation upon the right of taxation.

I am of the opinion, therefore, for the reasons above hinted at, and for others given by the Chief Justice, and Mr. Justice WOODWARD,

That the legislature may lawfully authorize municipal corporations to subscribe to the capital stock of railroad companies. And that such authority may be given directly to the corporate authorities, or it may be made to depend upon the assent of a majority of the incorporators.

That the authority may rightfully extend to the issuing of corporate bonds for the payment of the subscription, the interest and principal of which, if necessary, to be paid by taxes assessed upon the persons and property of the taxable citizens of the corporation, whose faith is pledged for the redemption of the bonds thus issued.

As a member of this Court I have nothing to do with the question of expediency. This must be determined, first, by the legislature in granting the power to subscribe; and second, by the people, either by their own votes, or through their selected agents, in availing themselves of the authority thus granted.

I am consequently opposed to awarding the injunction prayed for.