## Philadelphia Suburban Co. v. Lansdale Borough et al.

*Boroughs—Commercial business—Corporations—Electric light companies —Equity—Jurisdiction—Public Service Commission—Act of June 19, 1871.*

1. The Public Service Commission has no jurisdiction over boroughs, in so far as they engage in serving electricity.

2. Under the Act of June 19, 1871, P. L. 1360, a court of equity has jurisdiction to restrain a borough from engaging unlawfully in the business of serving electricity.

3. Where an electric light company is authorized by its charter to supply electricity to a township, and is willing and ready to do so, its rights are superior to those of an adjoining borough which seeks to enter its field, and, in a proper case, equity will enjoin the borough from such action.

4. A borough has no power to enter into a commercial contract, such as a bailment lease of motors to a company to which it supplies electricity.

Borough Code of May 14, 1915, P. L. 312, considered.

Hearing on bill, answer, replication and proofs. C. P. Montgomery Co., June T., 1921, No. 2, in Equity.

*Evans, High, Dettra & Swartz,* for plaintiff.

*Samuel D. Conver* and *Larzelere, Wright & Larzelere,* for defendants.

Philadelphia Suburban Co. *v.* Lansdale Borough et al.

SWARTZ, P. J., Jan. 24, 1922.—The plaintiff company has the chartered right to supply electricity to the inhabitants of the Township of Upper Gwynedd, in Montgomery County.

The Borough of Lansdale owns and operates an electric plant and furnishes electric current to consumers outside of its borough limits in said Township of Upper Gwynedd. Such service includes the construction of lines and the supply of current and power to the other defendant, the said W. Frank Vaughn, at his brick plant.

The plaintiff contends that such service to Mr. Vaughn by the said borough is unlawful, and the bill prays for a decree restraining its continuance, and also prays for an order "restraining the said borough from constructing any power and transmission lines in said Township of Upper Gwynedd, and from transmitting, delivering and furnishing electricity to such portions of the township wherein the complainant has extended and is extending its equipment to serve the inhabitants."

The defendants answer that the borough has the authority to do what it is doing under the provisions of the Borough Code of 1915.

### Findings of fact.

1. The Borough of Lansdale was incorporated under the General Borough Act of 1851. It has a population of almost 5000, and an area of one square mile. It is surrounded by four townships. Hatfield Township bounds the borough on the north, Upper Gwynedd on the south, Towamencin on the west, and Montgomery and Upper Gwynedd on the east. The four townships embrace a territory of almost forty-two square miles, and Lansdale is located near the centre of this entire surface area. The four townships are each of about equal size.

2. This territory is largely a farming community. There are some towns and villages, but none in close proximity to Lansdale. Hatfield Borough and the Borough of North Wales are each about two miles from Lansdale. West Point, in Upper Gwynedd, is about three miles distant.

3. There are some manufacturing plants within the boundaries of Lansdale. Those without, but close to the borough limits, are more numerous.

4. Letters-patent were issued to the Upper Gwynedd Electric Company on Sept. 28, 1912, to manufacture and supply light, heat and power, by means of electricity, to the Township of Upper Gwynedd. On Dec. 20, 1913, there was a merger of the Upper Gwynedd Company with the plaintiff corporation.

5. In 1910 the plaintiff company purchased the rights, property and franchises of the E. K. Freed Electric Company, which had its power plant in the Borough of North Wales. At that time the Freed Company had lines running from the said borough into Upper Gwynedd Township. It supplied electricity to various consumers in said township. Its lines extended into West Point, a large village located near the southwestern end of the township. The plaintiff company, after this purchase, made extensions from the Freed Company's existing lines. These radiated from the four sides of the Borough of North Wales.

6. The plaintiff company made no constructions or extensions northward into Upper Gwynedd toward Lansdale until about 1919. That is, three years ago they continued their line to the Bailey Body Works, in Upper Gwynedd beyond North Wales Borough, and two years ago they went northward toward Lansdale as far as Beaver Road. From Beaver Road they continued the line to a public road near the point where said road crosses the Reading Railway

2 D. & C.

tracks. This extension was built late in 1920 or early in 1921. It served two manufacturing plants at the point where the said public road crosses the railroad. No further construction or extension was made by plaintiff until the question of serving electric light and power to the Vitrified Shale Products Company arose. However, the plaintiff corporation, on March 31, 1920, had authorized the construction and continuance of this line to Church Road and along Church Road towards the Chalfont line, its objective destination. We have given the actual status of the plaintiff company as to its existing lines in Upper Gwynedd as they appeared early in 1921.

7. The Borough of Lansdale constructed its electric plant in 1899. It started with a capacity of ninety kilowatts. In 1906 the capacity was increased to 250, and in 1916 it added 500. It is now engaged in increasing the power by 1000 kilowatts. When this addition is finished the capacity will represent 1750 kilowatts. This last increase is necessitated by the increased requests for light and power, and also to provide for any emergency which may result from a breakdown of motors or other machinery. The cost of this last addition is estimated at $65,000.

8. As early as 1899 Lansdale constructed electric lines beyond the borough limits. In that year it ran a line eastward along the Welsh Road. This highway is the dividing line between Montgomery Township and Upper Gwynedd. The line was built on the Upper Gwynedd side of the Welsh Road.

In 1912 a line was constructed on the Welsh Road northwestwardly, and in 1913 the line was continued toward Orvilla, in Hatfield Township, and about three or four years ago was again extended. A line was constructed from the Welsh Road down the Church Road in 1914, and later was continued to a point south of Hancock Street about 700 feet from the Shale Products plant. In 1920 a spur was carried from Church Road to the pumping station on the Pennbrook Park development. The farmers' line, running southwestward from Lansdale, started about 1912, and the Kulpsville line, in the same locality, was constructed about 1917. The Gun Club line, in Upper Gwynedd, was built in 1914. The Hospital line, foundry lines, and the line extending toward Chalfont, in Bucks County, are located in Hatfield Township. There are other lines and extensions in the four townships. The total mileage of constructions in said townships surrounding Lansdale is over thirteen miles. In Upper Gwynedd alone the mileage of the existing lines is over three miles. The farmers' line, in Towamencin Township, is apparently the longest, being three miles long.

8. Some of these lines are owned by individuals or the customers, who are served by the borough. The borough, however, owns outside of its limits about six miles of pole lines. Lansdale keeps in repair, at its own expense, all lines, including those now owned by others. It has taken no indemnity from the private owners against any damages the borough may be compelled to pay by reason of accidents. The borough has liability insurance for its protection, but the character and extent of such insurance is not disclosed, nor the cost of the same to the borough.

9. In 1918 the borough constructed lines to transmit electricity to municipalities located beyond the four townships surrounding Lansdale. Proceedings in equity were commenced by a taxpayer to restrain these efforts to supply the Boroughs of Hatfield and Chalfont. In Day v. Borough of Lansdale, 35 Montg. Co. Law Repr. 27, we filed an order restraining the borough from carrying out and continuing these undertakings in the two boroughs named. The plaintiff company then purchased from Lansdale the line running to Chalfont. In our opinion we expressed doubt whether a borough

could, under the law, engage in an extensive commercial enterprise, such as the Borough of Lansdale was conducting.

10. Subsequent to the final decree in the Day case, Lansdale extended some of its lines in the four townships to points more remote than the termini existing in 1918, especially so in the Township of Upper Gwynedd.

11. Pennbrook Park is a large building lot development. The plot was staked out thirty years ago. Two drafts of the lots and streets were recorded, one twenty years ago, another five years later. There are now about twelve or thirteen houses upon the tract. Streets are laid out and opened to public travel. Gas and water-pipes were put down and the streets were graded. Some few cement side-paths are laid. The tract is located in Upper Gwynedd Township, These streets or roads have not been accepted by the township as public highways.

12. Pennbrook is located on the east side of Church Road, between the railroad on the south and Welsh Road on the north. Church Road runs parallel to the eastern boundary line of the borough, and the distance between these parallel lines is 1900 feet. There are some buildings along and near the borough line, but no other improvements between Church Road and the said borough line save two farm buildings and several houses on Hancock Street. Blue Springs Lake is to the northeast of Pennbrook Park. This is another experimental lot development that shows no signs of life, and is without a single house. Pennbrook Park has a swimming pool formed by damming up a small stream. The lower section of Pennbrook Park is about equidistant from Lansdale and North Wales Borough. But in the section of Pennbrook the houses now erected are nearer to Lansdale than to North Wales. By going along Church Road to Welsh Road and then following the latter, a pedestrian has the use of paved walks all the way to Lansdale, but some, however, are made with ashes. The people living in Pennbrook generally go to Lansdale for their groceries and supplies. Pennbrook is in no sense an outgrowth or overgrowth of Lansdale. It is not an overflow or spill-over beyond the borough lines. It is a separate and independent tract of ground. There is no continuous extension of improvement from Lansdale to Pennbrook. Farm land forms a belt more than one-third of a mile in width between Lansdale and Pennbrook. The house in Pennbrook most remote from Lansdale is one mile distant from the borough line going by streets. The few houses on the large tract are so scattered that they have no appearance of a settlement. They are located within a square whose sides are 2000 feet long.

13. The Shale Brick plant is still more distant from Lansdale. It is located near the intersection of the railway and Church Road. It is 2700 feet from the factory to the nearest boundary line of the borough. By the existing streets the distance is 4000 feet. There is the same intervening unimproved ground between this plant and Lansdale that is found in the Pennbrook location, except that there there is more of it both on the north and on the south side of the railroad. There is an outgrowth of buildings beyond the southeastern borough limits.

14. In 1919 J. Albert Miller, the manager of Pennbrook Park, applied to the plaintiff company for electric service. Three propositions were made to Mr. Miller. First, plaintiff was to build the line from its terminus to Pennbrook at the expense of the latter, repayment for the outlay by the plaintiff to be made at a certain rate for each consumer that was added to the service. Secondly, the plaintiff was to build the line upon a guaranty by Pennbrook of a certain amount of business. Lastly, to connect up with the Lansdale existing line, and plaintiff would obtain the current from Lansdale, if this could

2 D. & C.

be accomplished. It seems that the plaintiff did not succeed in bringing about such arrangement with Lansdale. Mr. Miller would not agree to either the first or second proposition. He then went to Lansdale, and, as already stated, the said borough made its first connection with the pumping station in Pennbrook in 1920. The propositions one and two made to Pennbrook were the same in kind that the Public Service Commission had approved. During and at the close of this war public utility companies were laboring under great difficulties, both as to materials and funds.

15. Mr. H. L. Irwin, the manager of Mr. Vaughn's shale brick factory, opened negotiations with Mr. Dutton, the representative of the plaintiff company. This was in 1918 or early in 1919. Conferences were had in February, March and April, 1921. Mr. Irwin needed two motors to run the brick plant by electric power, and Mr. Dutton was requested to obtain propositions from several manufacturers. The best he could do was an offer to furnish the two motors for about $1200. The plaintiff offered to extend its line at once to the Shale Products Company if the latter loaned to the plaintiff $2500 or purchased its bonds to the amount of $2000. The extension of the plaintiff's line along Church Street, however, was not dependent upon Mr. Irwin's acceptance of this proposition. The corporation had already resolved to extend its line along Church Road to connect with its Chalfont purchased line. The financial aid was solicited in order to give the brick company immediate connection and power service. Mr. Dutton understood that his proposition was accepted by Mr. Irwin. There was, however, no written contract or binding agreement on the part of the brick company. Mr. Dutton, in good faith, on March 12, 1921, purchased the transformers needed by the plaintiff company to make the connection at the brick plant. Their cost was $900. He also purchased the necessary wire at a cost of $800. He obtained permission from the brick company to place fifty poles on its railroad siding and purchased the poles. The work of construction on the ground was in fact commenced on May 12, 1921. The cost of building the line to the brick plant, including the transformers, was at least $4500.

16. Mr. Irwin admits that under the plaintiff's proposition the brick company was to buy its own motors and purchase bonds of the plaintiff company in the amount of $2000, or finance the undertaking in that sum. We repeat, the construction was not dependent upon an acceptance of the proposition, as the action of the plaintiff discloses. Mr. Irwin applied to Lansdale Borough after he had received the foregoing terms from the plaintiff. On May 2, 1921, the borough council referred the matter to its solicitor and the electric light committee. A contract with Mr. Vaughn, the proprietor of the brick company, was prepared. It was not before the borough council until May 16, 1921, and the borough council then "decided unanimously to go ahead with the extension." "Extension" meant the continuation of the borough's line on Church Road to the brick plant, a distance of 1000 feet. Mr. Miller, representing Pennbrook Park, was present at this meeting of the borough council and offered the aid of his attorneys to protect and secure the borough's rights in such extension, and to pay one-half of the costs of any legal suit should the borough lose.

17. The contract of the borough with Mr. Vaughn is an instalment bailment lease for two motors. The bailment is to continue for six months. The bailee was required to pay $500 upon the signing of the lease and a further instalment of $500 at the expiration of each two months of the lease. At the end of the term the bailee could buy the motors by the payment of the additional sum of $500. The purchase price was, therefore, $2500. In truth, the sum, $2500,

named in the lease includes the cost of the motors, $1300, and the cost of continuing the line for 1000 feet. So that the brick company obligated itself to pay the entire cost of extending the line, the motors and the installation of the connections. Why the $1200, the cost of line construction, was concealed and included in the cost of the motors was not fully explained. This lease was not signed by the borough officials until the case was on trial before the court. Mr. Irwin desired to withdraw the agreement at the meeting of council on May 16, 1921; that is, on the night it was first produced. Evidently he had some doubt as to the right of the borough to serve the brick plant with electric power under the transactions already recited. The borough would not consent to such withdrawal. Mr. Irwin, after the promised aid of Pennbrook Park, was satisfied to let the agreement stand.

18. The terms offered by the plaintiff to make the connection with the brick plant, even if they had been exacted, were more favorable to the brick plant than the bailment lease, except that the plant was not required to raise as much immediate cash. The plaintiff's offer was more favorable because it assumed the actual payment of the line construction and the installation of the transformers. Lansdale secured the contract because it bought, supplied and leased the machinery to operate the plant at an initial cost to the brick company of only $500. It also appears that the tariff rate for power current filed by the plaintiff with the Public Service Commission is below the rate scheduled by Lansdale Borough.

19. The plaintiff, on the morning of May 12, 1921, began work on the ground on Church Road to build a connecting line to the brick plant. Whatever misunderstanding there may have been, plaintiff, in good faith, started the construction and completed the line on Church Road, connecting it with its existing line at the intersection of the public road and the railroad. The line was fully completed along the brick plant before this bill was filed and before the borough actually supplied any power to the brick factory.

20. The superintendent of the borough electric plant did not come in contact with Mr. Irwin, the manager of the brick factory, until April, 1921. The contract with Mr. Vaughn did not appear before the borough council until May 16, 1921, and the resolution of council to go on with brick plant extension was not passed until that date. Still, on May 12, 1921, about 9.30 A. M., Mr. Dirks, the borough's electric superintendent, sent his workmen to commence the construction of a line 1000 feet long on Church Road to connect with the brick plant. This was four days before the borough council saw the agreement and four days before it decided to build the line. The plaintiff's workmen, prior to this hour, dug some holes on Church Road to plant poles then on the ground near the railroad crossing at the brick plant. Mr. Dirks, under advice received from Mr. Miller, of Pennbrook, ordered his men to string wires along trees and on an arm attached to a pole of the Bell Telephone Company. By this method of procedure Lansdale was first in making the connection, although the wire used was so light that it was insufficient to carry power current, and had to be replaced later by heavier wire.

21. This race for position was suspended by an agreement to hold a parley in the office of the plaintiff's counsel. The consultation was suspended to enable the solicitor for the borough to ascertain what the latter intended to do. Without further notice to the plaintiff, the borough went on with the work and made the connection by planting poles and using suitable wire. It began to supply the brick plant with power about June 1, 1921.

22. Under the sale of the Chalfont line, the borough agreed to furnish the necessary current from its plant to enable the plaintiff company to operate

2 D. & C.

that line. The plaintiff's construction at the time of this procedure, as already shown, terminated at Beaver Road. It had no existing line to furnish the current to Chalfont from its own plant.

23. The borough, in its construction of the Pennbrook line and its connection with the brick plant, expended $2481.40.

24. The borough never obtained the municipal consent of the Township of Upper Gwynedd to supply electricity to the inhabitants of said township. One of the supervisors had a conversation with the superintendent, Dirks, and told him he could go ahead. The township authorities never preferred any objection to the borough concerning existing lines.

25. To engage in generating and furnishing electricity is a hazardous business. This results from the rule of law "that any one using such a dangerous agent is bound not only to know of the extent of the danger, but to use the very highest degree of care practicable to avoid injury to every one who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them." Borough councilmen serve without pay, and are usually employed in looking after their own business affairs, and cannot give the time and attention that is demanded in the supervision of such a dangerous enterprise. They are necessarily dependent upon employees to whom they cannot give the required oversight. A single act of negligence, carelessness, inattention or ignorance of such employees may bring serious loss to the taxpayers of the borough. There is also the danger of financial loss in conducting any extensive commercial business.

## Discussion.

The material facts in this case are not in serious dispute.

The Borough of Lansdale is engaged in a commercial enterprise that involves a large investment of capital. It is taking steps to increase its business to still greater proportions. It is doing the business of a public service corporation in a territory comprising more than forty square miles.

The anxiety to increase its business enterprise is well illustrated by the methods employed to connect its lines with the Vitrified Shale Products Company and Pennbrook Park.

The plaintiff company, chartered to supply electricity to the inhabitants of Upper Gwynedd, was ready to discharge the duties assumed under its charter and merger. It offered to furnish the power current to the brick company. It started to construct its line to enable it to supply the electricity from its own plant. Whether it had a binding contract with Mr. Vaughn is not material. It believed it had. It commenced the work on the ground on May 12, 1921. It had purchased the supplies necessary to build the line and make the connections with the brick plant. The connection of the line, under the evidence, was not dependent upon the existence of a binding contract with Mr. Vaughn. The work was started in good faith to supply Mr. Vaughn's needs. The line was expeditiously constructed. The representative of the brick plant was not in touch with the superintendent of the Lansdale electric department until April, 1921. He had the proposition and terms of the plaintiff, and urged it to make speedy preparations to supply the factory with power. He then approached the Lansdale representative to ascertain whether he could make a deal with the borough at a lower immediate cash expenditure. Mr. Dirks of the Lansdale plant made an extraordinary offer. The borough was to go into the market, and, at its expense, equip the brick plant at a cost of $1300, and build the line and purchase the transformers for the additional

sum of $1200. The small initial cash of $500 demanded by the borough was the tempting bait.

The contract signed by Mr. Vaughn was not before the borough council until May 16, 1921. It does not appear that even at this time any specific action was taken by council to approve the instalment lease, except that the borough on that night decided to go on with the extension.

Four days before this meeting of council, Mr. Dirks, the superintendent, had put his men to make, and actually made, the connection on trees with the brick plant on May·12, 1921. When the borough decided to make the extension, Mr. Dirks, without any authority whatever from council, had already made the connection. Here was a race, but Lansdale had not as yet qualified to enter as a competitor. Mr. Irwin, for the brick plant, on May 16th, with knowledge of all the facts, requested the return of the Vaughn agreement. The borough protested against any such withdrawal.

Chapter VI, art. XVII, § 41, of the Borough Code of 1915, page 312, authorizes boroughs to supply electricity beyond their boundaries.

The act, however, was careful to say "nothing in this section shall conflict with the corporate rights of any corporation empowered to supply electricity in territory adjacent to such boroughs or with the rights of any other borough."

If the action of the Borough of Lansdale, under the foregoing facts and circumstances, does not conflict with the rights of the plaintiff corporation authorized to supply electricity in the adjacent Township of Upper Gwynedd, then it is difficult to conceive what acts can constitute such conflict.

The 41st section, in declaring that the borough shall not conflict with the corporate rights of any corporation in the same territory, implies that the corporation has at least the superior right in such territory, although it may not enjoy the sole right.

But it is contended that equity has no jurisdiction to pass upon the merits of this controversy; that the remedy must be sought before the Public Service Commission.

The Public Service Commission Act of July 26, 1913, P. L. 1374, in section 1, declares: "The term corporation . . . shall not include municipal corporations except as otherwise provided in this act."

There is no exception in any section of the act that covers the contingency before us. There is no attempt to vest in the Public Service Commission any supervision over boroughs except in matters referred to in articles II and III, which do not affect our case.

The Public Service Commission itself decided that it had no jurisdiction over boroughs so far as they engage in serving electricity. The commission cannot help consumers of borough current in any controversy with the borough. They must apply to the courts: Application of Towamencin Light, Heat and Power Co., 3 Corp. Rep. 366; Gilmore v. United Gas Co., 9 Corp. Rep. 262.

. These rulings are approved in Barnes Laundry Co. v. Pittsburgh, 266 Pa. 24. The court held that municipalities are not within the term "Public Service Companies," and are not subject at all to the jurisdiction of the Public Service Commission, except as to the limited extent referred to in the title and certain parts of the act.

It is also contended that the Borough of Lansdale is acting under corporate rights conferred by its charter, and that this court has no jurisdiction to determine whether the borough has exceeded its powers; that the Commonwealth alone must raise this question.

2 D. & C.

Philadelphia Suburban Co. v. Lansdale Borough et al.

If we are correct in holding that the controversy before us is not within the jurisdiction of the Public Service Commission, then it follows that equity jurisdiction must be tested by the rulings of our courts unaffected by the Act of 1913 creating the commission. If the term "corporation" used in the Act of June 19, 1871, P. L. 1360, includes municipal corporations, as held in Tyler Tube Co. v. Borough of Washington, 48 Pitts. L. J. 363, then equity is the remedy pointed out to determine whether Lansdale, under its charter, has the power it is exercising. The rights of the borough must be found in the act of assembly under which it is incorporated, especially the Borough Code of 1915. It is there we must search for the power.

It would certainly be a hardship upon the Commonwealth if she must start the proceedings in all cases where a borough is doing an act to the injury of an individual or corporation and alleges that the act was done under its chartered rights. The complainant who deems himself injured resorts, in such case, to the equity courts: Corey v. Edgewater Borough, 18 Pa. Superior Ct. 228.

Boroughs may be enjoined from doing many things they have no right to do: Trickett on Boroughs, 266.

Equity will restrain a borough from entering upon private lands without authority of law: Hancock v. Borough of Wyoming, 148 Pa. 635; or from subscribing for shares of stock in a railroad company: Sharpless v. Philadelphia, 21 Pa. 147.

In a suit between a borough and a railway company, it is not necessary that the bill should be filed by the Attorney-General: Easton v. Passenger Railway, 2 Pa. C. C. Reps. 639.

In furnishing a supply of water or electricity the municipality acts in the same capacity as a private corporation: Central I. and S. Co. v. Harrisburg, 271 Pa. 340.

We are also convinced that the bailment contract made by the borough with the brick plant was beyond the powers vested in the town council. We shall not repeat what we said upon this branch of the case in Day v. The Borough of Lansdale, 35 Montg. Co. Law Repr. 27, citing 3 Dillon on Municipal Corporations, § 1292, and Pasadena v. Pasadena L. and W. Co., 152 Cal. 579. Buying and selling factory equipment is foreign to the business of a borough.

We are, therefore, convinced that, in the equity proceeding before us, we have the power to restrain the Borough of Lansdale from supplying electric light and power to the Lansdale Vitrified Shale Products Company, on the ground that it clearly appears from the facts that the line constructed and connections made by Lansdale with the brick plant conflicted with the corporate rights of the plaintiff, and because the existing contract made by Lansdale is illegal.

The testimony took a somewhat wider range than the prayer for relief. The evidence was directed, particularly, to the location of the brick plant and the controversy between the parties in supplying electric current and power to that plant.

True, the testimony covered the surroundings of Pennbrook and its relation to the Borough of Lansdale. No specific allegation is made that the service and current now supplied in the Pennbrook development is an illegal exercise of power by Lansdale. There is no prayer that we should terminate such service, We do not see how we can interfere with the service now furnished by Lansdale to these consumers. They are not made parties to the bill. They have existing rights in the supply lines running to their homes and the wiring placed in their buildings. We cannot destroy these rights without affording

them a hearing. The same is true as to other customers receiving current in the said township from Lansdale. There is no prayer for a mandatory injunction.

Again, there is no specific allegation in the bill that the section in the Borough Code of 1915 upon which Lansdale relies for its authority to supply electricity beyond the borough limits is unconstitutional. The bill does allege that the borough is attempting to perform the functions of a public service corporation without obtaining a certificate of public convenience. It also declares that the borough operates in territory which is not adjacent to the corporate limits of Lansdale.

The bill does specifically say that the brick plant is not in territory adjacent to the borough. But a borough has no right to serve electricity in adjacent territory where the furnishing thereof, as in this case, is in direct conflict with the corporate rights of the plaintiff in said territory.

The evidence as to the surroundings of any locality, other than the brick plant and Pennbrook Park, is quite meager.

As already stated, there is no prayer that we order the existing service in Pennbrook to terminate, and customers now served are not in court.

We shall dispose of the Pennbrook Park service upon the ground that the borough cannot make connections for new customers, because such service would be in direct conflict with the corporate rights of the plaintiff, even if Pennbrook Park is adjacent territory to Lansdale.

We still think there is doubt whether section 41, art. xvii, chap. 6, of the Borough Code of 1915, is constitutional so far as it authorizes boroughs to supply electricity outside their limits, at least if such granted authority is intended to allow service in territory beyond the immediate ground or continuous overflow of the borough limits. We refer to the reason given in the Day case. We are also of opinion that we should confine our conclusions to the limited scope just defined, because the prayers of the bill do not ask specifically for any more extended relief.

We are asked "to restrain the construction of power and transmission lines in Upper Gwynedd Township." This must, of course, apply to future constructions. What future lines the borough intends to build we are not informed.

We are also asked to restrain the borough "from transmitting, delivering and furnishing electricity to such portions of the township wherein complainant has extended, and is extending, its equipment to serve the inhabitants thereof." What lines the plaintiff "is extending," beyond those noted on the draft, does not appear. How far service from any borough line conflicts with the service from the plaintiff's existing lines is not made clear, except that the borough's line on Church Road at Pennbrook Park creates such conflict. Of course, there was such conflict at the brick plant, as already shown.

We shall assume that Pennbrook Park is on adjacent territory to Lansdale. Our finding of facts, when applied to the word "adjacent," might sustain a different conclusion. We refer to our opinion in the Day case, where we considered the meaning of the term "adjacent." We also refer to Easton Power Co. *v.* Richards, 14 Northamp. Co. Repr. 290, and Pennsylvania Utilities Co. *v.* Lehigh Navigation Co., 4 Corp. Rep. 261. It is there said that "adjacent thereto" is the territory geographically close, but which no company has been chartered to serve, or which, if chartered, it cannot serve for physical or economic reasons.

We prefer to base our conclusion on the finding that service to new customers in Pennbrook Park, under all the evidence, would conflict with the

2 D. & C.

corporate rights of the plaintiff company. This seems to be the principal ground upon which the complaint in the bill is founded. When the negotiations between the representative of Pennbrook and the plaintiff corporation began, Lansdale was not prepared to serve the residents of Pennbrook. Lansdale knew that such negotiations were pending, because the plaintiff corporation applied to Lansdale for current from its plant to serve Pennbrook.

That the plaintiff corporation intended to supply Pennbrook was also apparent when it took the Chalfont line from the hands of Lansdale. The decree of the court made this line useless to Lansdale. The contract provided that Lansdale should furnish the current until the plaintiff could bring up its own lines to connect with the Chalfont purchase. The plaintiff had started to build toward Church Road, and naturally its lines would run up that road to make the desired connection with the Chalfont line.

The plaintiff corporation had also authorized the extension of its existing line along Church Road as early as March 31, 1920. Lansdale had full knowledge of the plaintiff's preparations to build along Pennbrook. It had this knowledge before it built its first connection at the pumping station in Pennbrook. It made its extension along Church Road after the Day decree became a final judgment. We suggested several reasons why the borough should not extend its lines at these distant points from the Lansdale boundaries. But the borough, after that decision, launched out in every direction to enlarge its commercial enterprise. Our suggestions and reasons may not have been well founded, and the borough council, if of that opinion, would naturally disregard them.

With full knowledge of the plaintiff's actual preparations to serve Pennbrook within a reasonably short time, the borough, just as in the brick plant controversy, entered into a race to outdistance the plaintiff corporation.

While the plaintiff corporation may not enjoy the exclusive right to serve the residents of Upper Gwynedd, it should, under the law, have the superior right where it is ready and willing to supply the current.

In Towamencin Light, Heat and Power Co., 3 Corp. Rep. 366, the Public Service Commission has well said that auxiliary service from a municipal plant cannot be compared with the service of a corporation that is subject to strict supervision as to rates, service and facilities. The consumer supplied by the borough has no protection or redress, except through the ordinary channels of the courts.

The plaintiff, when this bill was filed, was ready to make connections with any consumer in Pennbrook who desired a supply of current. The borough should not extend its service and supply in Pennbrook to any owner or resident therein unless the plaintiff refuses to render the service.

It is argued that such order will injure the borough because it has gone to the expense of running its lines to Pennbrook. We answer, it went into the field knowing that it was entering into a conflict with the corporate rights of the plaintiff. If the buildings that asked for the service and received it were not sufficient to justify the investment, the borough should have kept out. Its entrance into the contested district was a voluntary act.

It is against the policy of the law that a borough council should jeopardize the taxpayers' money in commercial enterprises. The danger is now more apparent than in 1918, for it appears that town council is increasing its plant and adding obligations of the taxpayers aggregating $65,000. It is contended that this is a matter for the borough council and no concern of the court. Our attention has not been called to any borough engaged in such an ambitious enterprise.

Philadelphia Suburban Co. *v.* Lansdale Borough et al.

Just what proportion of the electricity generated by the borough is used within the corporate limits is not clearly stated. The numerous lines in the four townships, and the manufacturing plants supplied with power outside the borough, must consume a large proportion of the current power developed. The addition of 1000 kilowatts shows that the borough is not engaged in selling surplus current, but generating a supply to increase its commercial business.

In Overall *v.* City of Madisonville, Kentucky, 102 S. W. Repr. 278, the court said: "In no instance of which we are aware has it been held by any court or allowed by any act of the legislature that a municipality could go into a commercial business purely as an enterprise of gain."

### Conclusions of law.

1. Equity has jurisdiction to consider the allegations in the bill, and to grant the remedies that are demanded under the evidence.

2. The plaintiff is entitled to an order against the Borough of Lansdale restraining it from supplying electric current and power to W. Frank Vaughn, trading as the Lansdale Vitrified Shale Products Company, at its plant located at or near the intersection of the Reading Railway and Church Road. This order to become effective thirty days after a final decree and judgment are entered.

3. The contract fully described and spread upon the record between the Borough of Lansdale and the said W. Frank Vaughn, trading as the Lansdale Vitrified Shale Products Company, called a bailment lease, is declared illegal, and the defendants are restrained from further operating thereunder.

4. The Borough of Lansdale is also restrained from supplying electric current or power to any resident or property owner within the limits of Pennbrook Park, fully described and outlined on the draft in evidence, except such consumers as it was serving before this bill was filed by plaintiff.

5. That the defendants pay the costs of this proceeding.

And now, Jan. 24, 1922, the foregoing findings and conclusions of law are filed in the office of the prothonotary, who will notify the parties or their counsel of such filing, and he will enter a decree *nisi* in accordance with our second, third, fourth and fifth conclusions of law, and if no exceptions are filed as provided by the equity rules, he will enter a final decree accordingly as of course.